

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-29-2000

# Pollice v. Natl Tax Funding

Precedential or Non-Precedential:

Docket 99-3856

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Pollice v. Natl Tax Funding" (2000). *2000 Decisions.* Paper 182.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/182

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 29, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 99-3856, 99-3857, 99-4049,
99-3858, 99-3859 and 99-3998

TITO POLLICE; VIOLET POLLICE, individually and on
behalf of all others similarly situated; LINDA MANSFIELD,

      Appellants in No. 99-3856

v.

NATIONAL TAX FUNDING, L.P.;
CAPITAL ASSET RESEARCH CORPORATION, LTD.

TITO POLLICE; VIOLET POLLICE, individually and on
behalf of all others similarly situated; LINDA MANSFIELD,

v.

NATIONAL TAX FUNDING, L.P.;
CAPITAL ASSET RESEARCH CORPORATION, LTD.

      Appellants in No. 99-3857

TITO POLLICE; VIOLET POLLICE, individually and on
behalf of all others similarly situated; LINDA MANSFIELD,

      Appellants in No. 99-4049

v.

NATIONAL TAX FUNDING, L.P.;
CAPITAL ASSET RESEARCH CORPORATION, LTD.

GLADYS HOUCK; MARIE DEMITRAS; BRAGETTE
PARKER; MARY WALSH, on their own behalf and on
behalf of all others similarly situated; MARY TABB,

      Appellants in No. 99-3858

v.

CAPITAL ASSET RESEARCH CORP., LTD.;
NATIONAL TAX FUNDING, L.P.;
CAPITAL ASSET HOLDINGS GP INC.

GLADYS HOUCK; MARIE DEMITRAS; BRAGETTE
PARKER; MARY WALSH, on their own behalf and on
behalf of all others similarly situated; MARY TABB,

v.

CAPITAL ASSET RESEARCH CORP., LTD.;
NATIONAL TAX FUNDING, L.P.;
CAPITAL ASSET HOLDINGS GP INC.

      Appellants in No. 99-3859

GLADYS HOUCK; MARIE DEMITRAS; BRAGETTE
PARKER; MARY WALSH, on their own behalf and on
behalf of all others similarly situated; MARY TABB,

      Appellants in No. 99-3998

v.

CAPITAL ASSET RESEARCH CORP., LTD.;
NATIONAL TAX FUNDING, L.P.;
CAPITAL ASSET HOLDINGS GP INC.

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civ. Nos. 98-00813 and 98-00850)
District Judge: Honorable Donald E. Ziegler

2

* Honorable Louis F. Oberdorfer, Senior Judge of the United States District Court for the District of Columbia, sitting by designation.
Argued: June 22, 2000

BEFORE: BARRY and GREENBERG, Circuit Judges, and OBERDORFER,* District Judge

(Filed: August 29, 2000)

      Michael P. Malakoff
      Rudy A. Fabian (argued)
      Malakoff Doyle & Finberg, P.C.
      Suite 200--The Frick Building
      Pittsburgh, PA 15219

      Bernard S. Rubb
      434 Oliver Road
      Sewickley, PA 15143

      Attorneys for Appellants and
      Cross-Appellees Tito Pollice,
      Violet Pollice and Linda Mansfield,
      individually and on behalf of all
      others similarly situated

      Donald Driscoll (argued)
      Laurence Norton
      Community Justice Project
      1705 Allegheny Building
      429 Forbes Avenue
      Pittsburgh, PA 15222

      Attorneys for Appellants and
      Cross-Appellees Gladys Houck,
      Marie Demitras, Bragette Parker,
      Mary Walsh and Mary Tabb, on
      their own behalf and on behalf of
      all others similarly situated

          Robert L. Byer (argued)
          Terry Budd
          David M. Aceto
          Joseph R. Gette
          Kirkpatrick & Lockhart LLP
          Henry W. Oliver Building
          535 Smithfield Street
          Pittsburgh, PA 15222

           Attorneys for Appellees and
          Cross-Appellants Capital Asset
          Research Corp., Ltd., National Tax
          Funding, L.P. and Capital Asset
          Holdings GP Inc.

OPINION OF THE COURT

GREENBERG, Circuit Judge.

These appeals present certified questions arising from two actions, Pollice v. National Tax Funding, L.P. et al. and Houck v. Capital Asset Research Corp., Ltd. et al. , which have been consolidated before the district court for pretrial purposes. The subject matter of both actions concerns the assignment of delinquent municipal tax and utility claims to defendant National Tax Funding, L.P. ("NTF "). We set forth the relevant factual and procedural background below.

I. BACKGROUND

For years, the City of Pittsburgh ("City"), the School District of Pittsburgh ("School District"), and the Pittsburgh Water and Sewer Authority ("PWSA") (collectively, the "government entities") accumulated a backlog of thousands of claims against homeowners who did not fully pay their property taxes or water or sewer bills. In order to eliminate this backlog, the government entities decided to sell the claims and the liens arising therefrom to NTF, which is in the business of purchasing such delinquent claims from municipalities in several states. App. at 135, 514. 1 In

_____

1. Appendix references are to the appendix filed in Nos. 99-3858 and 99-3859.

4

September 1996, the City and the School District entered into a Purchase Agreement whereby existing claims and liens for unpaid taxes and sewer charges were assigned to NTF.2 App. at 517. The Purchase Agreement also called for the City and the School District to sell NTF subsequent claims for the years 1996, 1997 and 1998. Under the agreement, the City and the School District retained the right to service the claims, and accordingly they entered into a Servicing Agreement with Capital Asset Research Corp., Ltd. ("CARC")3 pursuant to which CARC was to collect the claims for the benefit of NTF. App. at 859. The Servicing Agreement allowed the City and the School District to retain some measure of control over CARC's collection activities; for example, the agreement required CARC to make monthly reports to the City and the School District and it required CARC to offer homeowners "payment plans" having particular terms.

In April 1997, NTF entered into a similar Purchase Agreement with PWSA involving the assignment of unpaid water claims. App. at 886. Like the agreement with the City and the School District, the PWSA Purchase Agreement called for the assignment of not only existing claims but also future claims. Under the agreement, PWSA retained the right to service the claims, and it entered into a Servicing Agreement with CARC similar to the agreement between CARC and the City and School District. App. at 1099.

CARC then set about contacting homeowners in order to collect on the delinquent claims. According to defendants, NTF, through CARC, has endeavored to collect from the homeowners the same interest and penalties on the claims which the government entities collect under applicable local law. See app. at 139, 1141, 1146, 1151, 1196, 1198, 1221–23. Specifically, a City ordinance provides for a twelve percent annual rate of interest on unpaid property taxes, along with a one-half percent per month penalty. App. at
_____

2. The sewer claims had been assigned to the City by the Allegheny County Sanitary Authority.

3. Like NTF, CARC is a limited partnership. Both partnerships share a common general partner, Capital Asset Holdings GP Inc. App. at 1355.

5

1385. Another ordinance provides for a twelve percent annual rate of interest on claims for unpaid sewer charges assigned by the Allegheny County Sanitary Authority ("ALCOSAN") to the City, along with a one-time five percent penalty. App. at 1128. In addition, a PWSA resolution calls for interest at the rate of one-half percent per month and penalty at the rate of one percent per month on unpaid water and sewer charges. App. at 1119. At approximately the same time as the 1996 assignment, the City amended the ordinance regarding unpaid property taxes so as to permit interest and penalties to be compounded on a monthly basis. See app. at 444, 471-72, 487, 492-93, 502, 506-07.[4]

In response to CARC's collection efforts, some homeowners entered into payment plans permitting them to pay their debts--together with interest and penalty--over a period of time ranging from six to twenty-four months. Others paid the claims in full immediately.

On April 17, 1998, Gladys Houck and others (the "Houck plaintiffs") filed suit against NTF, CARC and Capital Asset Holdings GP Inc. ("CAH"), the general partner in NFT and CARC, in the Court of Common Pleas of Allegheny County. The action was removed to the district court on May 14, 1998. App. at 49. The complaint, as amended, asserted claims on behalf of homeowners under the United States and Pennsylvania Constitutions, the Pennsylvania Second Class City Treasurer's Sale and Tax Collection Act, the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTP/CPL"), the Pennsylvania Loan Interest Protection Law ("LIPL"), the federal Fair Debt Collection Practices Act ("FDCPA"), and the Pennsylvania Municipal Claims and Tax Liens Law. App. at 107-20. On May 8, 1998, Tito Pollice and others (the "Pollice plaintiffs") filed an action on behalf of property owners against NTF and CARC

_____

4. The Houck plaintiffs contend that "[a]t least to an extent, the rates and other charges imposed by Creditors [defendants] exceeded those which the municipal entities . . . claimed authority to charge and had in fact charged." See br. of appellants/cross-appellees in Nos. 99-3858 and 99-3859 at 9. Nevertheless, for purposes of this opinion, we will assume that NTF in fact has charged the same interest and penalties as the local ordinances and resolution authorize the government entities to charge.

6

in the district court asserting claims under the FDCPA and the federal Truth-in-Lending Act ("TILA"), along with claims for unjust enrichment and fraud. App. at 79-96. The central allegation in both cases, as relevant to these appeals, is that NTF, through CARC, has collected unlawfully high interest and penalties on the assigned claims.5 We will at times refer to the Houck plaintiffs and the Pollice plaintiffs as "homeowners" or"plaintiffs," collectively, even though the Pollice class includes property owners who are not homeowners, and we will at times refer to NTF, CARC and CAH as "defendants," collectively.

On July 20, 1998, the district court consolidated the Pollice and Houck matters for pretrial purposes. Defendants then moved for summary judgment on all claims in both actions, app. at 134-44, while the Houck plaintiffs moved for summary judgment on their FDCPA, UTP/CPL and LIPL claims.6 The district court ruled on the motions in an opinion and order dated July 29, 1999 and entered August 2, 1999. See Pollice v. National Tax Funding, L.P., 59 F. Supp.2d 474 (W.D. Pa. 1999). Relying on the recent decision of the Commonwealth Court in Maierhoffer v. GLS Capital, Inc., 730 A.2d 547 (Pa. Commw. Ct. 1999), appeal denied, 749 A.2d 473 (Pa. 2000), the district court indicated that the claims and liens in fact could be assigned to NTF under Pennsylvania law. See Pollice, 59 F. Supp.2d at 477 n.3. The court further indicated that NTF, as assignee of the government entities, is subject to a statutory provision permitting the collection of interest on municipal tax and utility claims at a rate not to exceed ten percent per year. See Pa. Stat. Ann. tit. 53, S 7143. The court rejected the argument that the City's status as a home rule municipality conferred the authority to pass

_____

5. The Houck action has been brought on behalf of owner-occupants of homes in Pittsburgh. The Pollice class is broader, involving all owners of real property in Pittsburgh subject to the assigned claims and liens. See oral arg. tr. at 5; app. at 81-82, 110. The Houck class thus is subsumed within the Pollice class.

6. On October 30, 1998, the district court approved a partial settlement in the Houck action relating to plaintiffs' constitutional claims and their claim under the Second Class City Treasurer's Sale and Tax Collection Act. See Pollice, 59 F. Supp.2d at 477 n.2.

ordinances setting higher rates on the claims. See Pollice, 59 F. Supp.2d at 478.

The court then addressed the merits of the homeowners' claims in light of its conclusion that NTF is subject to the ten percent interest cap. The court held that the Houck plaintiffs cannot recover excess interest paid under the LIPL because they have not paid interest as consideration for the "loan or use of money." In this regard, the court construed the term "use of money" in the LIPL to mean an agreement by a creditor to forbear from immediate action to collect a debt. The court indicated that the payment plans offered by defendants constitute such a forbearance, but it nevertheless concluded that those homeowners who entered into plans cannot recover because they have not paid any additional interest or penalties as consideration for this forbearance. See id. at 482-83.

The court then turned to the FDCPA claims (raised by both sets of plaintiffs). Defendants argued (1) that the water, sewer and tax obligations do not constitute "debts" under the FDCPA, (2) that NTF, CAH and CARC are not "debt collectors," (3) that defendants have not violated the substantive provisions of the FDCPA, and (4) that defendants in any event are protected by the FDCPA's "bona fide error" exclusion. See id. at 484-85. The court dismissed the claims of both sets of plaintiffs as against NTF and CAH and with respect to defendants' conduct in collecting the tax claims. The court held that NTF and CAH are not "debt collectors" under the FDCPA because "they are not in the business of collecting debts and do not in fact collect debts." Id. at 486. By contrast, the court concluded that CARC is a "debt collector" subject to liability under the statute and that CARC does not fall within a provision exempting government officers or employees. Relying on our decision in Staub v. Harris, 626 F.2d 275 (3d Cir. 1980), the court further held that the water and sewer obligations constitute "debts" for purposes of the FDCPA but that the tax obligations do not. See Pollice, 59 F. Supp.2d at 485. The court then indicated that CARC has acted in violation of the FDCPA by seeking to collect rates of interest and penalties for the water and sewer claims in excess of that authorized by state law. See id. Finally, the

8

court found material questions of fact regarding the"bona fide error" defense, and it denied the Houck plaintiffs' motion for summary judgment. See id. at 486-87.

With respect to the Pollice plaintiffs' TILA claim, defendants argued (1) that NTF and CARC are not "creditors" under TILA, (2) that TILA's public utility exemption is applicable with respect to the water and sewer claims, and (3) that no "consumer credit transactions" within the meaning of TILA ever took place. The court granted summary judgment in favor of CARC and additionally dismissed the claim with respect to defendants' conduct relating to the tax obligations. The court indicated that NTF acted as a "creditor" under TILA by entering into payment plans with homeowners, but it concluded that CARC is not a "creditor" because "it is merely an agent, rather than the entity to which the debts are payable." Id. at 488 n.14. Influenced again by Staub, the court indicated that the payment plans constitute "consumer credit transactions" under TILA, but only with respect to the water and sewer claims and not the tax claims. See id. at 490-91. The court further held that TILA's public utility exemption is inapplicable. See id. at 489-90.

Finally, the district court granted summary judgment in favor of defendants with respect to the Pollice plaintiffs' unjust enrichment claim. In the district court's view, this claim is "largely dependant on the argument that the original owners of the liens and claims [the government entities] could not assign their right to charge higher interest and penalties to National Tax." Id. at 491. The court rejected this argument in light of Maierhoffer, and thus it dismissed the unjust enrichment claim.7 See id.

The Pollice and Houck plaintiffs subsequently moved to alter or amend the July 29, 1999 judgment, but the district court denied their motions in orders dated September 20, 1999 and entered September 21, 1999. The district court then modified the July 29 and September 20 orders to

_____

7. In addition, the court dismissed the Houck plaintiffs' UTP/CPL claim and the Pollice plaintiffs' fraud claim. These rulings are not challenged on appeal.

9

certify various questions for appeal pursuant to 28 U.S.C.
S 1292(b). We granted petitions for permission to appeal.

II. JURISDICTION and STANDARD OF REVIEW

The district court had jurisdiction over both actions
pursuant to 28 U.S.C. SS 1331 and 1367. We have
jurisdiction over these appeals pursuant to 28 U.S.C.
S 1292(b). " `As the text of S 1292(b) indicates, appellate
jurisdiction applies to the order certified to the court of
appeals, and is not tied to the particular question
formulated by the district court.' " Abdullah v. American
Airlines, Inc., 181 F.3d 363, 366 (3d Cir. 1999) (quoting
Yamaha Motor Corp. v. Calhoun, 516 U.S. 199, 205, 116
S.Ct. 619, 623 (1996)). We may address "any issue fairly
included within the certified order because it is the order
that is appealable, and not the controlling question
identified by the district court." Id. (citation omitted). Our
standard of review in this appeal involving only questions of
law is plenary. Id.

III. DISCUSSION

A. State Law Issues

We are called upon to determine whether the district
court erred in its disposition of the LIPL and unjust
enrichment claims. Before doing so, we must address two
preliminary questions of Pennsylvania law: (1) the
assignability of governmental rights relating to tax and
utility claims and liens, and (2) the applicability of the ten
percent interest provision under Pa. Stat. Ann. tit. 53,
S 7143.

1. Assignability

Homeowners argue that governmental rights relating to
tax and utility claims and liens may not be assigned to
private entities under Pennsylvania law. As the district
court correctly noted, however, the Pennsylvania
Commonwealth Court recently held that municipal claims
and the liens arising therefrom are assignable to private
entities under a provision of the Municipal Claims and Tax
Liens Law, Pa. Stat. Ann. tit. 53, S 7147. See Maierhoffer,

10

730 A.2d at 549-51 ("[U]nder [section 7147], a municipality may assign any claim, tax or municipal, to a party that is a stranger to the original transaction . . . ."). Section 7147 provides in pertinent part:

> Any claim filed or to be filed, under the provisions of this act, and any judgment recovered thereon, may be assigned or transferred to a third party, either absolutely or as collateral security, and such assignee shall have all the rights of the original holder thereof.[8]

Homeowners argue that Maierhoffer is contrary to prior decisions of the Pennsylvania Supreme Court and therefore we should not follow it. In addition, they request that we certify this issue to the Pennsylvania Supreme Court. The Supreme Court, however, denied a petition for allowance of appeal in Maierhoffer on January 20, 2000. See 749 A.2d 473 (Pa. 2000). Accordingly, we believe that the Supreme

---

8. The term "tax claim" is defined as "the claim filed to recover taxes." Pa. Stat. Ann. tit. 53, S 7101. The term "municipal claim" is defined as follows:

> (1) the claim arising out of, or resulting from, a tax assessed, service supplied, work done, or improvement authorized and undertaken, by a municipality, although the amount thereof be not at the time definitely ascertained by the authority authorized to determine the same, and a lien therefor be not filed, but becomes filable within the period and in the manner herein provided, (2) the claim filed to recover for the grading, guttering, macadamizing, or otherwise improving, the cartways of any public highway; for grading, curbing, recurbing, paving, repaving, constructing, or repairing the footways thereof; for laying water pipes, gas pipes, culverts, sewers, branch sewers, or sewer connections therein; for assessment for benefits in the opening, widening or vacation thereof; or in the changing of water-courses or the construction of sewers through private lands; or in the highways of townships of the first class; or in the acquisition of sewers and drains constructed and owned by individuals or corporations, and of rights in and to use the same; for the removal of nuisances; or for water rates, lighting rates, or sewer rates, and (3) the claim filed to recover for work, material, and services rendered or furnished in the construction, improvement,

> maintenance, and operation of a project or projects of a body politic
> or corporate created as a Municipal Authority pursuant to law.

Id. (emphasis added)

Court would not accept certification of this issue and thus we will not certify the question and delay these proceedings.[9] We have reviewed Maierhoffer carefully and have concluded that it was decided correctly. Thus, we follow Maierhoffer in concluding that the government entities had the power to assign their rights relating to the tax, water and sewer claims and liens to NTF, and that NTF as assignee thereby stands in the shoes of the government entities with respect to these claims and liens. Therefore, NTF is entitled to collect interest and penalties on the assigned claims to the same extent as the government entities are entitled under relevant state and local law.

2. Applicability of ten percent interest provision

Homeowners contend that the combined interest and penalty charges imposed by NTF on the assigned claims are unlawful under the Municipal Claims and Tax Liens Law. Section 7143 which is a provision of that law reads in pertinent part:

> Interest as determined by the municipality at a rate not to exceed ten per cent per annum shall be collectible on all municipal claims from the date of the completion of the work after it is filed as a lien, and on claims for taxes, water rents or rates, lighting rates, or sewer rates from the date of the filing of the lien therefor.

Pa. Stat. Ann. tit. 53, S 7143 (emphasis added).[10]

Like the district court, we conclude that NTF, as assignee of claims belonging to the government entities, is subject to section 7143. The plain language of section 7143 permits the collection of interest on a municipality's claim for taxes,

_____

9. The decision to allow an appeal from the Commonwealth Court –– like the decision to accept a certification petition from a federal court –– is a matter of the Supreme Court's discretion. See  Pa. R. App. P. 1114.

10. The term "taxes" is defined as "any county, city, borough, incorporated town, township, school, bridge, road, or poor taxes." Pa. Stat. Ann. tit. 53, S 7101. The term "municipality" is defined as "any county, city, borough, incorporated town, township, school district, county institution district, and a body politic and corporate created as a Municipal Authority pursuant to law." Id.

12

water rents or rates, or sewer rates,11 but the rate is limited to ten percent per annum. The term "municipality" includes not only cities, but also school districts and municipal authorities. See Pa. Stat. Ann. tit. 53,S 7101. Thus, NTF, as assignee of the City, the School District, and the PWSA, is entitled to collect interest on the assigned claims up to this ten percent cap. See Horbal v. Moxham Nat'l Bank, 697 A.2d 577, 583 (Pa. 1997) ("Under the law of assignment, the assignee succeeds to no greater rights than those possessed by the assignor."). There can be no dispute that NTF has exceeded the cap.

Defendants argue that the City, as a home rule municipality, acted within its power in passing the ordinances setting the interest and penalty rates at issue here. Yet, it is clear that under the Home Rule Charter and Optional Plans Law (the "Home Rule Law") a home rule municipality may not act in contravention of state laws applicable to municipalities. Under the Home Rule Law, "[a] municipality which has adopted a home rule charter may exercise any powers and perform any function not denied by the Constitution of Pennsylvania, by statute or by its home rule charter." 53 Pa. Cons. Stat. Ann. S 2961. Further, the Home Rule Law provides that, "[w]ith respect to the following subjects, the home rule charter shall not give any power or authority to the municipality contrary to, or in limitation or enlargement of, powers granted by

_____

11. In City of Philadelphia v. Holley, 220 A.2d 396 (Pa. Super. Ct. 1966), the court construed the term "rents or rates" as used in section 7143:

> The words `rents or rates' are not defined by the act and must be given their plain everyday meaning. Webster's Third New International Dictionary defines a `rate' as`a charge per unit of a public-service commodity (as electricity, gas, water)', and defines `water rate' or `water rent' as `a rate or tax for supply of water'. To the average householder, his water rent or rate means either a flat charge for the water furnished him or a charge for each unit of water coming into his home. He understands his gas and electric rate the same way. Our Supreme Court gave judicial approval to this general usage in Jolly v. Monaca Borough , 216 Pa. 345, 65 A. 809 (1907), where the court defined a water rate as the price paid for water as a commodity.

Id. at 398 (citations omitted).

13

statutes which are applicable to a class or classes of municipalities"; among the listed subjects is "[t]he filing and collection of municipal tax claims or liens and the sale of real or personal property in satisfaction of them." 53 Pa. Cons. Stat. Ann. S 2962(a)(1). Clearly, the assessment of interest and penalties on delinquent tax obligations falls within the scope of "collection of municipal tax claims." Another provision of the Home Rule Law states that "[a] municipality shall not . . . [e]xercise powers contrary to, or in limitation or enlargement of, powers granted by statutes which are applicable in every part of this Commonwealth." 53 Pa. Cons. Stat. Ann. S 2962(c)(2). Based on the clear language of the Home Rule Law, we conclude that a home rule municipality may not exceed the ten percent interest limit set forth in section 7143.

Defendants argue that the interest and penalty rates set by the City with respect to the tax claims are lawful under the following provision of the Home Rule Law:

> Establishment of rates of taxation.--No provision of this subpart or any other statute shall limit a municipality which adopts a home rule charter from establishing its own rates of taxation upon all authorized subjects of taxation . . . .

53 Pa. Cons. Stat. Ann. S 2962(i).12 Defendants contend that "rate of taxation" includes the rate of interest and penalties on delinquent tax obligations. Plaintiffs respond that "establishing the rate of taxation is not the same as assessing a rate of interest on an already delinquent tax." See reply br. of appellants/cross-appellees in Nos. 99-3856 and 99-3857 at 15.

_____

12. The Home Rule Law defines "rate of taxation" as "[t]he amount of tax levied by a municipality on a permissible subject of taxation." 53 Pa. Cons. Stat. Ann. S 2902. "Subject of taxation" is defined as follows:

> Any person, business, corporation, partnership, entity, real property, . . . personal property, property interest, transaction, occurrence, privilege, transfer, occupation or any other levy which is
> determined to be taxable by the General Assembly. The term shall not be construed to mean the rate of tax which may be imposed on a permissible subject of taxation.

Id.

14

Like the district court, we agree with plaintiffs that a home rule municipality's authority to set "rates of taxation" does not include the authority to set interest and penalty rates on delinquent taxes. "Rate of taxation" undoubtedly means the rate which is applied to the value of property in order to determine the amount of the tax owed; its plain meaning does not include the rate of interest or penalty on overdue tax obligations. The rate of interest on tax obligations is directly governed by Pa. Stat. Ann. tit. 53, S 7143, which expressly limits "[i]nterest" on "claims for taxes."

Finally, defendants argue that the interest and penalty rates on water and sewer claims set by the PWSA resolution do not violate section 7143 because the annual rate of "interest" under the resolution is less than ten percent. As stated, under the resolution, the "interest" charge is one-half percent per month while the "penalty" charge is one percent per month. App. at 1119. Defendants argue that section 7143 by its terms limits only the rate of "interest" and not the rate of "penalty."13  The district court rejected defendants' argument, finding that "this distinction [between interest and penalty] rings hollow when applied to the instant set of facts." Pollice, 59 F. Supp.2d at 479. The court stated that no municipality "may evade the requirements of the Municipal Claims Act [section 7143] by converting interest in excess of that which is statutorily authorized to a `penalty.' " Id. We agree with the district court's reasoning. There appears to be no actual distinction between the monthly "interest" charge and the monthly "penalty" charge under the PWSA resolution; indeed, there would be no practical difference if the one percent "penalty" rate were labeled an "interest" rate and the one-half percent "interest" rate were labeled a "penalty" rate.

In attempting to draw a valid distinction between "interest" and "penalty," defendants argue that the former

_____

13. This argument is applicable only to the rates set by the PWSA resolution. Under the City ordinances applicable to unpaid property taxes and unpaid sewer claims assigned to the City by ALCOSAN, the rate of "interest" is twelve percent annually, leaving aside the "penalty."
See app. at 1128, 1385.

15

"compensates the government for the lost time-value" of unpaid obligations, while the latter "does not necessarily compensate the government for the lost value of money, and generally imposes an added cost on the delinquent party as punishment for noncompliance with the law." Br. of appellees in No. 99-3998 at 40-41. We, however, find this distinction to be artificial and thus we agree with the district court that a municipality should not be permitted to avoid the ten percent limit by arbitrarily labeling some portion of the monthly charge as "penalty" rather than "interest."

In sum, we conclude that NTF, as assignee of the government entities, is subject to section 7143 and that it has violated that provision by imposing interest charges on the assigned claims in excess of ten percent per annum.

3. The LIPL claim

Homeowners seek relief under the Loan Interest Protection Law ("LIPL"), Pa. Stat. Ann. tit. 41, S 101 et seq.[14] Under that law, "the maximum lawful rate of interest for the loan or use of money in an amount of fifty thousand dollars ($50,000) or less in all cases where no express contract shall have been made for a less rate shall be six per cent per annum." Pa. Stat. Ann. tit. 41, S 201. The law further provides that "[i]f any maximum lawful rate of interest provided for in this act is inconsistent with the provision of any other act establishing, permitting or removing a maximum interest rate . . . then the provision

_____

14. In Appeal No. 99-4049, the Pollice plaintiffs present arguments regarding the LIPL. Yet, at the time of the district court's July 29, 1999 ruling on the motions for summary judgment, only the Houck plaintiffs had asserted a claim under the LIPL. The Pollice plaintiffs later amended their complaint to add such a claim, but the district court never made any disposition of the Pollice plaintiffs' claim. Defendants contend that we lack jurisdiction to hear the Pollice plaintiffs' arguments regarding the LIPL because the certified orders did not address their LIPL claim. We agree that we lack jurisdiction to make any ruling regarding the Pollice plaintiffs' LIPL claim. See Zulkowski v. Consolidated Rail Corp., 852 F.2d 73, 75-76 (3d Cir. 1988) (jurisdiction under 28 U.S.C. S 1292(b) is "limited to a review of the order of the district court"). Nevertheless, in the course of our discussion of the LIPL, we will consider some of the points raised in the Pollice plaintiffs' briefs.

16

of such other act shall prevail." Pa. Stat. Ann. tit. 41, S 604. The LIPL provides a cause of action to recover usurious interest:

> A person who has paid a rate of interest for the loan or use of money at a rate in excess of that provided for by this act or otherwise by law or has paid charges prohibited or in excess of those allowed by this act or otherwise by law may recover triple the amount of such excess interest or charges in a suit at law against the person who has collected such excess interest or charges . . . .

Pa. Stat. Ann. tit. 41, S 502 (emphasis added). Homeowners argue that they have "paid [to NTF] a rate of interest for the loan or use of money . . . in excess of that provided for . . . otherwise by law" because the interest and penalty rates exceeded the ten percent limit of Pa. Stat. Ann. tit. 53, S 7143. Alternatively, homeowners argue that they have "paid charges prohibited or in excess of those allowed . . . otherwise by law."

As set forth in the preceding section, we agree with plaintiffs' contention that NTF has charged interest and penalties at a rate in excess of the ten percent permitted by section 7143. The district court nevertheless held that homeowners cannot recover under the LIPL because they have not paid the interest and penalties as consideration "for the loan or use of money." In this regard, the district court recognized a distinction between, on the one hand, charges imposed on account of a debtor's failure to make timely payment of money when due ("detention"), and on the other, money received by a creditor as consideration for agreeing to refrain from immediately collecting a debt ("forbearance"). Relying largely on cases construing usury statutes from other jurisdictions, the district court indicated that only in the latter situation has there been a "use of money" under the LIPL. The court then indicated that no forbearance occurred here until NTF, through CARC, entered into payment plans with some of the homeowners. See Pollice, 59 F. Supp.2d at 482 ("[T]he terms provided in the payment plans should be read as constituting a forbearance under the Pennsylvania usury

17

law. A forbearance is widely considered a `use of money' for the purposes of usury law.").

The district court further concluded, however, that even those homeowners who have entered into payment plans cannot recover under the LIPL. The court reasoned as follows:

> [W]e believe that an interest rate beyond that allowed by law can only be considered usurious if it exists as consideration for the creditor's forbearance.
>
> While it has been established that the interest rate charged by defendants is beyond that allowed under Pennsylvania law, and that defendants, through the payment plans, are forbearing on collecting the money owed, it has not been shown that the rate being charged is in any way consideration for this forbearance. The facts presented illustrate that defendants have received no additional consideration in return for the terms offered under the payment plans. The interest rate charged for late payment is not consideration for the payment plans, but a part of the consideration for the original transaction.
>
> Further, defendants are not charging plaintiffs a rate for participating in the plans which is higher than plaintiffs would be charged if they did not participate. This is therefore not the typical forbearance situation, in which the debtor could not pay his or her obligation upon its due date and the creditor agreed to extend the period of repayment of the debt for additional consideration.
>
> Thus, the facts of this case preclude us from finding that defendants, by offering the payment plans and thus forbearing on the immediate collection of the debt owed, modified the original transaction so as to bring it within the ambit of the Pennsylvania Loan Interest Protection Law.

Id. at 483 (citations omitted).

Pennsylvania courts have not specifically addressed whether there has been a "loan or use of money" under the LIPL in the detention context. Several cases from other

18

jurisdictions indicate that usury laws apply only when a creditor agrees to take interest in exchange for making a loan or promising to forbear from the immediate collection of a debt; there is no usury when a creditor simply charges a debtor for failure to make timely payment of a debt when due. For example, in Smith Machinery Co. v. Jenkins, 654 F.2d 693 (10th Cir. 1981), the court considered a promissory note which called for interest at the rate of twelve percent to accrue after maturity. Id. at 694. Reasoning as follows, the court held that the New Mexico usury statute was inapplicable to such postmaturity charges:

> In the absence of language in the usury statutes that compels a different conclusion, the courts have generally held the limitations on interest rates charged do not apply to postmaturity charges. The rationale is that because postmaturity charges are within the debtor's control they are penalties for nonpayment rather than charges for the use of money and, therefore, they are not affected by usury laws. Such charges may be deemed usurious, however, when state laws limit interest rates which can be applied on the `detention' as well as the use of money.

> N.M.Stat.Ann. S 56-8-9 A (1978) indicates the scope of coverage of the usury limits of the New Mexico provisions cited above. [The statute provides:] `(N)o person, corporation or association, directly or indirectly, shall take, reserve, receive or charge any interest, discount or other advantage for the loan of money or credit or the forbearance or postponement of the right to receive money or credit except at the rates permitted in Sections 56-8-1 through 56-8-21 NMSA 1978.'

> All the terms of the statute denote consensual agreements between the parties, indicating that a withholding or detention by the borrower not consented to by the lender is not within the statute's purview. The mere fact that the parties have agreed to the rate to be paid after the debt is due does not make an arrangement a forbearance. In the instant case there was no agreement that [the debtor] could defer

19

payment after maturity; the situation was a `detention' of money rather than a `forbearance' and, as such, we do not think the New Mexico courts would hold it is covered by the statute.

Id. at 696 (citations and footnote omitted); see also Scientific Prods. v. Cyto Med. Lab., Inc., 457 F. Supp. 1373, 1379 (D. Conn. 1978) ("[I]t does not necessarily follow that charges at a rate in excess of that prohibited at the inception of a loan are usurious when imposed only on the unpaid balance after the loan has matured . . . . Here there was no agreement that the [debtor] could defer payment. Many cases have held that since charges of this nature are within the borrower's control, they are penalties for non-payment, rather than charges for the use of money, and, therefore, not affected by the usury laws."); Rangen, Inc. v. Valley Trout Farms, Inc., 658 P.2d 955, 960 (Idaho 1983) ("[The creditor] was imposing a late charge on accounts in arrears . . . . [W]e agree that the usury laws are inapplicable to this type of transaction. The charge was a valid late charge which could have been avoided if[the debtor] had paid its account when due. There was neither an express or an implied agreement to forbear or extend the time for payment."); Widmark v. Northrup King Co., 530 N.W.2d 588, 591 (Minn. Ct. App. 1995) ("[W]e conclude that the `late charges' assessed by [the creditor] did not constitute a usurious rate of interest. [The creditor] never actually agreed to forego an immediate action on[the debtor's] account if it became overdue in exchange for a late charge. Unlike typical credit arrangements, [the creditor] did not encourage late payments in order to recover the additional charge . . . . Consequently, we hold that there was no forbearance here within the meaning of the usury laws."); see also 47 C.J.S. Interest & Usury S 122 (1982) ("[Usury statutes] apply only to those contracts which in substance involve a loan of money or forbearance to collect money due, and so, where there is no loan or forbearance, there can be no usury . . . . A charge imposed because of the late payment of a debt comes within the definition of interest under a usury statute only where it is paid as

20

consideration for the creditor's forbearance of asserting his right of collection.").15

Of course, cases from other jurisdictions are not controlling with respect to the meaning of a Pennsylvania statute. Nevertheless, in the absence of Pennsylvania case law directly on point, we predict that the Pennsylvania Supreme Court would follow the approach taken by these other courts. The phrase "paid a rate of interest for the loan or use of money" under section 502 of the LIPL implies that there is some consensual arrangement between the parties; that is, an agreement by the lender or creditor to make a loan, or to grant the debtor the "use" of money by promising to forebear from taking immediate action to collect a debt, in exchange for interest. We believe there has been no "loan or use of money" under section 502 when a debtor simply detains money which the creditor wishes to receive immediately.

In re Kenin's Trust Estate, 23 A.2d 837 (Pa. 1942), supports our conclusion. In that case, a trustee failed to make proper delivery of trust proceeds. The Supreme Court addressed the question whether "damages for the[trustee's] detention of funds" should be measured by the legal rate of interest set forth in the Act of May 28, 1858, P.L. 622, a predecessor to the current LIPL. Id. at 844. As paraphrased by the court, P.L. 622 "fix[ed] at 6% the lawful rate of interest for the loan or use of money, in all cases where no express contract shall have been made for a less rate." Id. at 844 n.4. The court indicated that the statute was inapplicable, and instead held that damages should be measured by "what the money so detained would have produced if it had been delivered to those entitled to it." See id. at 844-45. The court commented as follows:

> The Act of May 28, 1858, P.L. 622 . . . does not rule
> the question of `damages for detention'. The word `use'

_____

15. Of course, there may be other limits on a creditor's ability to collect
charges for detention. For example, a provision in an agreement calling for unduly high late payment charges may be unenforceable as a penalty under general liquidated damages principles. See Rangen, 658 P.2d at 958, 963. The sole question before us here is whether the usury law is applicable in the detention situation.

21

> when referring to money is often employed as a synonym for `loan'. Money is not `used' within the meaning of this act when it is detained under the circumstances here present.

Id. at 844 n.4 (emphasis added).16

Homeowners present a somewhat complex argument in an attempt to demonstrate that Kenin is not controlling here. They point out that Pennsylvania law draws a distinction between (1) "interest as such or interest eo nomine," which is recoverable "when afixed sum is due from a date certain," and (2) "damages for detention or delay," which are recoverable "when the amount or onset of the obligation is not certain." Reply br. of appellants/cross-appellees in Nos. 99–3858 and 99–3859 at 8; see American Enka Co. v. Wicaco Mach. Corp., 686 F.2d 1050, 1056–57 (3d Cir. 1982); Peterson v. Crown Fin. Corp., 661 F.2d 287, 292–95 (3d Cir. 1981); Frank B. Bozzo, Inc. v. Electric Weld Div. of the Fort Pitt Div. of Spang Indus., Inc., 498 A.2d 895, 898–901 (Pa. Super. Ct. 1985); 20 Pennsylvania Law Encyclopedia Interest and Usury SS 4, 6–8 (1990). In the former situation--where there has been a failure to pay a fixed or liquidated sum due on a certain date--the party to whom the sum is owed may as a matter of right recover prejudgment interest at the legal rate of six percent running from the date the sum is due. See American Enka , 686 F.2d at 1056–57; Peterson, 661 F.2d at 293; Miller v. City of Reading, 87 A.2d 223, 225 (Pa. 1952) ("[I]t is the law of Pennsylvania that a debtor who defaults in the payment of the principal of an obligation when due and payable becomes liable for interest from the date of such default at

_____

16. A statement in another Pennsylvania decision supports the conclusion that the Pennsylvania usury statute applies only where there has been a loan or a forbearance. See Equipment Fin., Inc. v. Grannas, 218 A.2d 81, 82 (Pa. Super. Ct. 1966) ("[T]he law seems to be settled that usury can only attach to a loan of money or to the forbearance of a debt . . . .") (citation omitted); see also 20 Pennsylvania Law Encyclopedia Interest and Usury S 22 (1990) ("Usury contemplates the existence of a loan, and when there is no loan, usury cannot arise."). Although Grannas addressed the LIPL's predecessor statute, that statute --like the current LIPL--contained the "loan or use of money" requirement.

22

the legal rate of 6% per annum until payment is made, irrespective of the rate prescribed in the obligation itself for the period prior to maturity . . . . [I]n the absence of an agreement to the contrary, a liquidated claim carries interest at the legal rate from the time the debt becomes due."); Daset Mining Corp. v. Industrial Fuels Corp., 473 A.2d 584, 594-95 (Pa. Super. Ct. 1984) ("In claims that arise out of a contractual right, interest has been allowed at the legal rate from the date that payment was wrongfully withheld, where the damages are liquidated and certain, and the interest is readily ascertainable through computation."); see also Pa. Stat. Ann. tit. 41, S 202 (setting the "legal rate of interest" at six percent per annum). In the latter situation--where the breach involves something other than an obligation to pay a liquidated sum on a certain date--recovery of delay damages "will not be a matter of right, . . . [but] will be an issue for thefinder of fact, the resolution of which depends upon all the circumstances of the case." Frank B. Bozzo, 498 A.2d at 900 (citation and internal quotation marks omitted).

According to the homeowners, there has been a "use of money" under the LIPL when money is detained in the former situation; that is, prejudgment interest is due for the debtor's "use of the liquidated amount due the creditors from the date due." Reply br. of appellants/cross-appellees in Nos. 99-3858 and 99-3859 at 8. Homeowners contend that this case falls into the former category, i.e., interest as such, because it involves their failure to pay liquidated sums for tax, water and sewer obligations which were due on a certain date; they further contend that interest is recoverable but only at the legal rate of six percent per annum unless otherwise permitted by law. They argue that Kenin falls under the latter category, i.e. , damages for detention or delay, and therefore is not applicable here.

Despite the homeowners' argument, we adhere to our belief that the Pennsylvania Supreme Court would hold that there has been no "loan or use of money" within the meaning of Pa. Stat. Ann. tit. 41, S 502 in the absence of a loan or an agreement by the creditor to forbear. Plaintiffs' argument revolves around the concepts of prejudgment interest and damages for delay, both of which are awarded

23

by a court to compensate a prevailing party for the lost time-value of money running from the date of the opposing party's breach of contract or breach of duty. See American Enka, 686 F.2d at 1056 ("Common law pre-judgment interest is based on the principle of compensation and the understanding that a plaintiff wrongfully deprived of a sum of money is not made whole unless the delay in recovery is accounted for."). We are not concerned here, however, with the proper amount of prejudgment interest which defendants might be awarded by a court. Rather, we are called upon to address whether homeowners may employ section 502 to recover interest and penalties already paid to NTF. We believe they cannot in the absence of a loan or a forbearance. Further, we note that case law indicates that a creditor may collect interest at a rate higher than six percent in situations involving the failure to pay a liquidated sum, if the parties have agreed to such higher rate. See Miller, 87 A.2d at 225-26; Daset Mining, 473 A.2d at 595. If such agreements are permitted, then it is apparent that there has been no "use of money" within the meaning of sections 201 and 502 of the LIPL--otherwise, such agreements would be usurious.

We further agree with the district court's conclusion that the payment plans constitute a forbearance giving rise to the "use of money" for purposes of the LIPL. See 47 C.J.S. Interest & Usury S 131 (1982) ("The forbearance, or giving time for the payment, of a debt is, in substance, a loan, and when there is an existing and matured debt, a charge made by the creditor for his binding promise to forbear for a definite period to collect it, greater than that allowed by law, will subject the debt forborne to all the penalties prescribed by the law for usury."). A letter from CARC to the Pollices stated as follows with regard to the payment plans:

> The full amount of the [assigned] Claims is due immediately. Please make your check payable to National City Bank of Pennsylvania as custodian for NTF . . . .
>
> In the event you are currently unable to satisfy this obligation in full, you may pay the Claims over a longer period of time in accordance with the installment

24

purchase payment plan (the "Payment Program") . . . .
The longer you wait to pay the Claims, the more you
accumulate in additional interest, penalties, filing fees
and costs (including attorney's fees). Interest and
penalties are added to the total amount of the Claims
at a rate, not to exceed, 1.5% per month (compounded
monthly).

There are two different payment plans, 1) Water[and]
2) City, School and Sewer. Under the Payment
Program(s), you may choose to pay the Claims over
time in monthly installments . . . . Payments will be
calculated to ensure that the full amount of the
Claims, plus all interest, penalties and costs, will be
paid in full with the last payment you agree to make
. . . .

. . . If you successfully complete the Payment Program,
and the total amount of Claims, plus all acquired[sic]
interest, penalties and costs are paid in full, the liens
securing Claims against the Property will be removed
and marked satisfied. If you default under the Payment
Program, the money you have previously paid will not
be returned, but will instead be applied against the
Claims . . . .

App. at 97. A payment plan enrollment form included with
the letter provided as follows:

I understand that if I do default in the payment of
installments as provided above . . . all payments that
I have made under the Payment Program will be
applied pro rata to the principal, interest and penalty
due on the claims and thereafter NTF or agents may
take legal action against me or the Property to satisfy
the outstanding amounts owed on the Claims . . . .

App. at 98. Thus, by virtue of the payment plans, NTF has
agreed to forbear from taking immediate action to collect on
the assigned claims.17

_____

17. It is evident that no forbearance occurred prior to the payment plans;
prior to the plans, neither the government entities nor defendants had
granted homeowners any right to defer payment of their debt. The fact
that the government entities sat idle for periods of time without taking
any action with respect to the claims does not mean that there was a
forbearance.

25

The district court concluded, however, that "an interest rate beyond that allowed by law can only be considered usurious if it exists as consideration for the creditor's forbearance." Pollice, 59 F. Supp.2d at 483 (emphasis added). The court stated that "it has not been shown that the rate being charged is in any way consideration for this forbearance" because "defendants are not charging plaintiffs a rate for participating in the plans which is higher than plaintiffs would be charged if they did not participate." Id. We agree with the district court. " `Usury' has been variously defined as contracting for or reserving something in excess of the amount allowed by law for the forbearance of money, the exaction of more than lawful interest in exchange for the loan or use of money, directly or indirectly, and as an excessive charge for the loan or forbearance of money." 47 C.J.S. Interest & Usury S 4 (1982). Thus, "[i]n general, the elements of usury consist of an unlawful intent, money or its equivalent, a loan or forbearance, an understanding that the loan shall or may be returned, and the exaction for the use of the loan of something in excess of what is allowed by law." Id. S 119.

Here, no price in the form of heightened interest or penalties has been extracted or charged in exchange for the right to enter into a payment plan--rather, it appears undisputed that those homeowners who have entered into payment plans have been charged the same interest and penalty rates as those who did not enter into a plan. See br. of appellants/cross-appellees in Nos. 99-3858 and 99-3859 at 9, 28-30; substituted br. of appellants/cross-appellees in No. 99-4049 at 7. Thus, NTF simply has continued to collect what it would have sought to collect had the homeowners not entered into payment plans."The prime purpose of [usury] statutes is the protection of weak and needy borrowers from extortion and outrageous demands of unscrupulous lenders who are ready to take undue advantage of the necessities of others . . . ." 47 C.J.S. Interest & Usury S 88 (1982). Here, NTF has made no "outrageous demands" for additional interest or penalties in exchange for agreeing to forbear. Accordingly, the purposes of the usury law are not implicated.18

_____

18. Homeowners argue that "[i]t is inconceivable that the legislature could have intended to protect debtors who agree to pay an excessive

26

Homeowners contend that NTF has received consideration that is non-monetary in form; specifically, they assert that the payment plans require homeowners to agree to be personally liable for the delinquent obligations and to be liable for attorneys' fees. Homeowners argue that usurious "interest" can "take many forms other than money." Substituted br. of appellants/cross-appellees in No. 99-4049 at 33. They argue that "collateral consideration for a forbearance, in addition to the interest rate itself, should be taken into account" and that "requiring a personal obligation as a consideration for a

_____

interest rate in return for forbearance, but only if this excessive rate was not already being charged them." They contend that, "[b]ased on the District Court's holding, . . . no sophisticated creditor would fail to unilaterally impose excessive interest pre-forbearance agreement, if only to avoid a usury claim." Reply br. of appellants/cross-appellees in Nos. 99-3858 and 99-3859 at 13-14. As we have indicated, sections 201 and 502 of the LIPL do not apply to charges which are imposed for a debtor's detention of money owed. If a creditor who collects such charges for detention subsequently agrees to forbear without imposing greater charges, then the post-forbearance charges are still in effect charges for detention, and the forbearance has not changed the relationship so far as the usury law is concerned. The situation is fundamentally different where a new or higher rate is charged in connection with the forbearance.

In essence, those homeowners who made the decision to enroll in payment plans found themselves in the same position with regard to the payment of interest and penalties as homeowners who did not. It appears that the payment plans do not prohibit homeowners from paying their debts ahead of the schedule set forth in the plans. Thus, like those homeowners who did not enter into plans, those who did could pay their debts immediately and thus avoid the accrual of additional interest and penalties; alternatively, both sets of homeowners could choose to delay full payment of their debts and thereby accrue interest and penalties at the same rate. The primary difference between the two sets of homeowners lies in NTF 's promise to forbear from immediate action on the liens--those who entered into payment plans could claim the comfort of NTF 's forbearance, while those who did not ran the risk of losing their homes if they did not pay the claims in full immediately. Under these circumstances, we do not believe that one set of homeowners should have an LIPL claim in relation to the interest and penalty charges while the other does not.

27

loan, may be sufficient additional consideration when added to interest, to exceed the maximum allowable rate." Substitute reply br. of appellants in No. 99-4049 at 24.

We do not question the proposition that non-monetary as well as monetary consideration may be taken into account in determining if a creditor has extracted an unlawful amount of value in return for a loan or a forbearance. See 47 C.J.S. Interest & Usury S 154 (1982) ("Usury may be paid and received in property as well as in money. In order to determine whether the interest received by a lender, in the form of property, is usurious, the medium of payment is reduced to its equivalent in dollars . . . and if the value of the medium when so ascertained is more than the lawful rate on the debt or obligation on which the interest is paid, it amounts to the collection of usury."); see also Hartranft v. Uhlinger, 8 A. 244, 246 (Pa. 1887) ("It is, indeed, wholly immaterial under what form or pretense usury is concealed, if it can by any means be discovered, our courts will refuse to enforce its payment."); Smith v. Smith, 45 Pa. Super. 353 (1911) (indicating that usury law was applicable where "the defendant [borrower], in consideration of the loan, agreed to give to the plaintiff [lender] something more than the interest fixed by law as the compensation due to the plaintiff, to wit, four atlases."). We believe, however, that the usury analysis should take into account only those items (be they monetary or non-monetary in form) which actually are paid as consideration for the loan or forbearance. We have concluded that the interest and penalties paid by those who entered into payment plans have not been paid as consideration for NTF 's forbearance; thus, the interest and penalties should not be considered in the usury analysis, regardless of the fact that other things of value (such as personal liability or liability for attorneys' fees) may have been given as consideration.19 Therefore, we reject the position that Judge Oberdorfer takes in his partial dissent.

In sum, we conclude that homeowners (including those who entered into payment plans) have not "paid a rate of
_____

19. We note that defendants dispute that the payment plans give rise to personal liability or liability for attorney's fees.

28

interest for the loan or use of money" under Pa. Stat. Ann. tit. 41, S 502 when paying the interest and penalties at issue. Homeowners argue that they are nevertheless entitled to recover under section 502 because they have "paid charges prohibited or in excess of those allowed . . . otherwise by law." We reject this argument. The term "charges" in section 502 must refer to something other than "interest," as the word "interest" is listed in section 502 separately from the word "charges." See  section 502 ("A person who has paid a rate of interest for the loan or use of money . . . or has paid charges .. . may recover triple the amount of such excess interest or charges . . . ."). Homeowners have paid "interest," but such interest has not been paid "for the loan or use of money." See br. of appellees in No. 99-4049 at 38-39. If we were to read "charges" to include interest that is not paid"for the loan or use of money," then the "loan or use of money" language in section 502 would be superfluous.

We thus conclude that homeowners are without a remedy under the LIPL, and we will affirm the dismissal of the Houck plaintiffs' LIPL claim.[20]

4. Unjust enrichment

The district court viewed the Pollice plaintiffs' unjust enrichment claim[21] as "largely dependant on the argument

_____

20. Defendants also rely on a line of cases holding that the usury statute does not apply to a sale of goods on credit. See In re Estate of Braun, 650 A.2d 73, 77 (Pa. Super. Ct. 1994); Grannas , 218 A.2d at 82 ("[T]his act [the predecessor to the LIPL] does not apply to a bona fide sale of goods on credit. Such sales are the result of a decision by a buyer to purchase property on credit at a higher price than he would pay if he paid cash. There is no loan or use of money on the part of the buyer."). In light of our conclusion that homeowners are not entitled to relief under the LIPL in any event, we need not address this line of cases.

21. In Appeal No. 99-3998, the Houck plaintiffs present arguments regarding unjust enrichment. Yet, at the time of the district court's July 29, 1999 ruling on the motions for summary judgment, only the Pollice plaintiffs had asserted an unjust enrichment claim. It was not until some two months later that the Houck plaintiffs were granted leave to amend their complaint to add an unjust enrichment claim. As was the case with the Pollice plaintiffs' LIPL claim, we lack jurisdiction to make any ruling regarding the Houck plaintiffs' unjust enrichment claim because the certified orders did not address that claim. As the unjust enrichment issue is the only issue raised by the Houck plaintiffs in Appeal No. 99-3998, we will dismiss that appeal.

29

that the original owners of the liens and claims[the government entities] could not assign their right to charge higher interest and penalties to National Tax." Pollice, 59 F. Supp.2d at 491. In light of the Maierhoffer ruling on assignability, the court dismissed the unjust enrichment claim. While the district court viewed this claim as limited to what may be termed a "non-assignability" theory, the Pollice plaintiffs' complaint appears broad enough to encompass a claim based on an "illegal rate" theory--i.e. that the defendants have been unjustly enriched by virtue of their collection of interest and penalties beyond that allowed by Pa. Stat. Ann. tit. 53, S 7143. See app. at 93. The district court did not address such a theory. Under the circumstances, we will reverse the grant of summary judgment in defendants' favor and allow further proceedings with respect to the unjust enrichment claim. The district court should consider whether the Pollice plaintiffs have waived the illegal rate theory by choosing to proceed on a non-assignability theory.22  The district court also may consider any other defenses to an unjust enrichment claim which have been properly preserved by defendants.

B. FDCPA Issues

1. Whether the water, sewer and tax obligations
      constitute "debts"

The Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. S 1692 et seq., provides a remedy for consumers who have been subjected to abusive, deceptive, or unfair debt collection practices by debt collectors. See Zimmerman v.

_____

22. Defendants contend that the Pollice plaintiffs are estoped to pursue the illegal rate theory based on an interrogatory response in which the plaintiffs stated as follows: "There is no authority under state law for the
City, the School District and the Water Authority to assign the right possessed by each of them to assess interest and penalties at an aggregate rate of 1.5% per month." See app. at 1327 (emphasis added); br. of appellees in No. 99-4049 at 22. The Pollice plaintiffs contend that their response inadvertently omitted the word "allegedly" from the emphasized phrase. On remand, the district court should consider this interrogatory response, as well as other relevant factors, to determine if the Pollice plaintiffs in fact waived the illegal rate theory.

HBO Affiliate Group, 834 F.2d 1163, 1167 (3d Cir. 1987). "A threshold requirement for application of the FDCPA is that the prohibited practices are used in an attempt to collect a `debt.' " Id.; see 15 U.S.C. SS 1692e-f. The FDCPA defines "debt" as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." 15 U.S.C. S 1692a(5).

Like the district court, we conclude that homeowners' water and sewer obligations meet the definition of"debt"; indeed, these obligations constituted "debts" from the time they initially were owed to the government entities, and they retained that status after their assignment to NTF. At the time these obligations first arose, homeowners ("consumers" of water and sewer services) had an "obligation . . . to pay money" to the government entities which arose out of a "transaction" (requesting water and sewer service) the subject of which was "services. . . primarily for personal, family, or household purposes."23

Defendants, relying on a statement in our Zimmerman decision, argue that the water, sewer and tax claims are not "debts" because there was no "offer or extension of credit" to homeowners. See Zimmerman, 834 F.2d at 1168 ("We find that the type of transaction which may give rise to a `debt' as defined in the FDCPA, is the same type of transaction as is dealt with in all other subchapters of the Consumer Credit Protection Act, i.e., one involving the offer or extension of credit to a consumer.") (emphasis added). As the district court noted, see Pollice, 59 F. Supp. 2d at 484 n.9, this statement from Zimmerman has been widely

_____

23. As mentioned, the Pollice class includes all owners of real property in
Pittsburgh subject to the assigned claims and liens, while the Houck class is limited to owner-occupants of homes. We are certain that the water and sewer obligations owed by members of the Pollice class who own their property for business purposes are not "debts" because the services are not "primarily for personal, family, or household purposes." On remand, the district court will be required to distinguish any such members of the Pollice class from those members who are owner-occupants of homes for purposes of the FDCPA claims.

31

disavowed by several other courts of appeals, which have taken the broader view that the FDCPA applies to all obligations to pay money which arise out of consensual consumer transactions, regardless of whether credit has been offered or extended. See, e.g., Romea v. Heiberger & Assocs., 163 F.3d 111, 114 n.4 (2d Cir. 1998) (noting that several circuits have "disavowed" the "dicta" in Zimmerman that the FDCPA applies only to transactions involving the "offer or extension of credit"); Brown v. Budget Rent-A-Car Sys., Inc., 119 F.3d 922, 924 n.1 (11th Cir. 1997) (rejecting Zimmerman "[t]o the extent that it read an extension of credit requirement into the definition of debt"); Bass v. Stolper, Koritzinsky, Brewster & Neider, 111 F.3d 1322, 1325-26 (7th Cir. 1997) (rejecting Zimmerman and indicating that "[a]s long as the transaction creates an obligation to pay, a debt is created"); see also Wayne Hill, Annotation, What Constitutes "Debt" for Purposes of Fair Debt Collection Practices Act, 159 A.L.R. Fed. 121, 131 (2000) ("The term `debt' as used in the [FDCPA] has been construed broadly to include any obligation to pay arising out of a consumer transaction.").

We are not bound by the "disavowed" statement in Zimmerman, as it was dictum.24 In our view, the plain meaning of section 1692a(5) indicates that a "debt" is created whenever a consumer is obligated to pay money as a result of a transaction whose subject is primarily for personal, family or household purposes. No "offer or extension of credit" is required. Accordingly, homeowners' original obligations to pay the government entities for water

_____

24. In Zimmerman, we held that the FDCPA did not apply to attempts to collect money from persons who allegedly had committed cable television theft. See Zimmerman, 834 F.2d at 1167-69. We indicated that the FDCPA was intended to protect those who have "contracted for goods or services and [are] unable to pay for them," and that the statute was not intended to "protect against a perceived problem with the use of abusive practices in collecting tort settlements from alleged tortfeasors through threats of legal action." Id. at 1168. Clearly, there was no "debt" in Zimmerman because the obligations arose out of theft rather than a "transaction." This was our holding and we certainly adhere to it. The further statement that a transaction must involve the "offer or extension of credit" in order to be covered by the FDCPA was not necessary to the decision.

32

and sewer service constituted "debts," even though the government entities did not extend homeowners any right to defer payment of their obligations.

We further agree with the district court's conclusion that homeowners' property tax obligations do not constitute "debts" under the FDCPA. In Staub v. Harris, 626 F.2d 275, we specifically held that a per capita tax obligation is not a "debt" for purposes of the FDCPA. Id. at 276-79. We stated that "at a minimum, the statute contemplates that the debt has arisen as a result of the rendition of a service or purchase of property or other item of value. The relationship between taxpayer and taxing authority does not encompass the type of pro tanto exchange which the statutory definition [of `debt'] envisages." Id. at 278; see also Beggs v. Rossi, 145 F.3d 511, 512 (2d Cir. 1998) (following Staub and stating that in the tax situation "[t]here is simply no `transaction' . . . of the kind contemplated by the statute"). Staub is controlling here. Simply put, property taxes are not obligations "arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes."

The Houck plaintiffs contend that the property tax obligations are "debts" because they arise out of the "transaction" in which each property owner acquired his or her property. See reply br. of appellants/cross-appellees in Nos. 99-3858 and 99-3859 at 47-48. We reject this argument. Unlike a sales tax, for example, which arguably arises from the sale transaction, the property taxes at issue here arose not from the purchase of property but from the fact of ownership. In Beggs, the Court of Appeals for the Second Circuit rejected an argument similar to that of the Houck plaintiffs regarding a tax on automobiles. See Beggs, 145 F.3d at 512. The court stated that "the tax is not levied upon the purchase or registration of the vehicle per se, but rather upon the ownership of the vehicle by the citizen"; thus, the court held that there was no "transaction" for purposes of the FDCPA. Id. (emphasis added). We agree with this reasoning.

In attempting to distinguish Staub, the homeowners argue that the tax obligations changed in character and

33

became "debts" when they were assigned to NTF. We disagree. Although the tax claims were transferred to a private entity, the homeowners' obligation to pay the claims still did not "aris[e] out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes." Rather, the obligation to pay arose from the levying of taxes upon the ownership of property. After assignment of the claims to NTF, there still had not been a "transaction" involving the homeowners; their obligation to pay NTF still arose from the levying of taxes.25

The Houck plaintiffs contend that the creation of the payment plans distinguishes this case from Staub --that is, the payment plans for the tax obligations represent "transactions" giving rise to "debts" covered by the FDCPA. See reply br. of appellants/cross-appellees in Nos. 99-3858 and 99-3859 at 44-45, 49. While we do not doubt that the

_____

25. Plaintiffs rely on our decision in Simon v. Cebrick, 53 F.3d 17 (3d Cir. 1995), in arguing that the tax claims changed in character upon their assignment to NTF. The plaintiff in Simon was a private purchaser of tax lien certificates on certain real property in New Jersey. Id. at 19. The plaintiff requested the FDIC--which held mortgages on the property--to consent to foreclosure of its mortgage interests. Id. The FDIC refused. Id. The plaintiff commenced foreclosure proceedings in state court; the FDIC removed to federal court, where it argued that federal law precluded the plaintiff from extinguishing its mortgages without its consent. Id. The plaintiff argued that the Tax Injunction Act ("TIA") divested the district court of jurisdiction. Id. at 22. We disagreed:

     We do not necessarily agree with plaintiff that the district court's
     application of [12 U.S.C.] S 1825(b)(2) to protect the mortgage
     interests of the FDIC violates the TIA because it suspends the
     collection of taxes under state law until the FDIC consents to
     foreclosure of the tax liens. Withholding consent to foreclose from a
     private citizen does not implicate the assessment, levy, or collection
     of any tax. The statute is intended to prevent interference with
     taxation by governmental entities; however, upon the sale of the tax
     certificate, the tax obligation is satisfied. The holder's inability to
     foreclose does not affect the governmental entity's ability to assess,
     levy, or collect any tax, and thus, the TIA is not applicable.

Id. We believe Simon is inapposite here, as it involved an entirely different federal statute (the TIA) with different underlying purposes.

34

payment plans are "transactions," we do not believe the plans serve to bring defendants within the coverage of the FDCPA with respect to the tax obligations. The FDCPA is aimed at the conduct of debt collectors who are seeking to collect "debts." See 15 U.S.C. S 1692 (statement of congressional findings and purpose); Zimmerman , 834 F.2d at 1167. For purposes of the FDCPA, we view the payment plans simply as one aspect of defendants' course of conduct in attempting to collect the original water, sewer and tax obligations which were owed to the government entities and then assigned to NTF; that is, all of defendants' debt-collection activity (including the creation of the payment plans and subsequent conduct) has been directed toward the collection of the original obligations, not any obligations which may have arisen from the payment plans. As we have concluded, in their original form, the water and sewer obligations were "debts" under section 1692a(5) but the tax obligations were not. Accordingly, we hold that the FDCPA is inapplicable to all of defendants' conduct relating to the tax obligations, including conduct occurring after the creation of the payment plans.

In sum, we will affirm the dismissal of the FDCPA claims with respect to the tax obligations, and we further will affirm the district court's determination that the water and sewer obligations constitute "debts" under the FDCPA.

2. Whether NTF and CAH are "debt collectors" under the
        FDCPA

The district court accepted defendants' argument that NTF and CAH "cannot be considered `debt collectors' because they are not in the business of collecting debts and do not in fact collect debts." Pollice 59 F. Supp.2d at 486. The court agreed with defendants' contention that CARC is "the sole defendant which has contracted with the [government entities] to service and collect the claims owned by [NTF]." Id. Accordingly, the court dismissed the FDCPA claims against NTF and CAH. Id. at 491. The Houck plaintiffs argue on appeal that NTF and CAH, along with CARC, are "debt collectors" under the FDCPA.

The FDCPA's provisions generally apply only to "debt collectors." Pettit v. Retrieval Masters Creditors Bureau, Inc.,

35

211 F.3d 1057, 1059 (7th Cir. 2000). Creditors--as opposed to "debt collectors"--generally are not subject to the FDCPA. See Aubert v. American Gen. Fin., Inc. , 137 F.3d 976, 978 (7th Cir. 1998) ("Creditors who collect in their own name and whose principal business is not debt collection . . . are not subject to the Act . . . . Because creditors are generally presumed to restrain their abusive collection practices out of a desire to protect their corporate goodwill, their debt collection activities are not subject to the Act unless they collect under a name other than their own."); Staub, 626 F.2d at 277 ("The [FDCPA] does not apply to persons or businesses collecting debts on their own behalf."); Hon. D. Duff McKee, Liability of Debt Collector to Debtor under the Federal Fair Debt Collection Practices Act, 41 Am. Jur. Proof of Facts 3d 159, at S 3 (1997) [hereinafter McKee] ("[I]nterestingly, the term `debt collector' does not include the creditor collecting its own debt.").

The FDCPA contains a detailed definition of "debt collector." See 15 U.S.C. S 1692a(6). The term means "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." Id. The definition excludes several categories of persons, including officers or employees of government. See id.

We conclude that NTF is a "debt collector," and accordingly the district court should not have dismissed the FDCPA claims against it. Courts have indicated that an assignee of an obligation is not a "debt collector" if the obligation is not in default at the time of the assignment; conversely, an assignee may be deemed a "debt collector" if the obligation is already in default when it is assigned.26

_____

26. The FDCPA's definition of "creditor" is "any person who offers or extends credit creating a debt or to whom a debt is owed, but such term does not include any person to the extent that he receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt for another." 15 U.S.C.S 1692a(4). The definition of "debt collector" excludes "any person collecting or attempting to collect
any debt owed or due or asserted to be owed or due another to the extent such activity . . . (iii) concerns a debt which was not in default at
the time it was obtained by such person." 15 U.S.C. S 1692a(6)(F).

36

See Bailey v. Security Nat'l Servicing Corp., 154 F.3d 384, 387-88 (7th Cir. 1998); Whitaker v. Ameritech Corp., 129 F.3d 952, 958-59 (7th Cir. 1997); Wadlington v. Credit Acceptance Corp., 76 F.3d 103, 106-07 (6th Cir. 1996); McKee S 3 ("[O]ne who acquires the debt after it is in default is deemed a debt collector, and is subject to the provisions of the Act. Conversely, the assignee of a debt who acquires it before default is considered the owner of the debt and may pursue collection without concern for the limitations of the FDCPA."). Here, there is no dispute that the various claims assigned to NTF were in default prior to their assignment to NTF. Further, there is no question that the "principal purpose" of NTF 's business is the "collection of any debts," namely, defaulted obligations which it purchases from municipalities.27

As mentioned, the district court was influenced by the fact that only CARC contracted to undertake debt-collection activity in connection with the assigned claims. We believe, however, that NTF may be held vicariously liable for CARC's collection activity. Although there is relatively little case law on the subject of vicarious liability under the FDCPA, there are cases supporting the notion that an entity which itself meets the definition of "debt collector" may be held vicariously liable for unlawful collection activities carried out by another on its behalf. In Fox v. Citicorp Credit Services, Inc., 15 F.3d 1507 (9th Cir. 1994), the court indicated that a company which had been asked to collect a defaulted debt could be held vicariously liable for its attorney's conduct which was in violation of the FDCPA. See id. at 1516. By contrast, in Wadlington , supra, the Court of Appeals for the Sixth Circuit declined to impose vicarious liability on a company for the actions of its attorney; in the court's view, vicarious liability could not be imposed because the company itself did not meet the definition of "debt collector":

---

27. Defendants' motion for summary judgment before the district court stated that "NTF exists solely for the purpose of holding claims for delinquent taxes and municipal obligations." App. at 135. Further, an affidavit of a CARC officer provides that "NTF purchases liens and claims from municipal entities across the country" and it refers to "the delinquent liens and claims [NTF] owns." App. at 514.

> We do not think it would accord with the intent of
> Congress, as manifested in the terms of the [FDCPA],
> for a company that is not a debt collector to be held
> vicariously liable for a collection suit filing that violates
> the Act only because the filing attorney is a`debt
> collector.' Section 1692k imposes liability only on a
> `debt collector who fails to comply with [a] provision of
> this subchapter . . . .' The plaintiffs would have us
> impose liability on non-debt collectors too. This we
> decline to do.

Wadlington, 76 F.3d at 108 (citation omitted) (emphasis
added). The Wadlington court specifically distinguished Fox
because in Fox the entity allegedly vicariously liable for the
attorney's conduct was itself a debt collector. See id. The
rule to be gleaned from Fox and Wadlington has been
summarized by a state court decision as follows:

> [F]ederal courts that have considered the issue have
> held that the client of an attorney who is a `debt
> collector,' as defined in S 1692a(6), is vicariously liable
> for the attorney's misconduct if the client is itself a debt
> collector as defined in the statute. Thus, vicarious
> liability under the FDCPA will be imposed for an
> attorney's violations of the FDCPA if both the attorney
> and the client are debt collectors as defined in
> S 1692a(6).

First Interstate Bank of Fort Collins v. Soucie , 924 P.2d
1200, 1202 (Colo. Ct. App. 1996) (emphasis added).

Although these cases involved the attorney-client
situation, we believe they may be applied here. Thus, we
conclude that NTF--which itself meets the definition of
"debt collector"--may be held vicariously liable for CARC's
collection activity. We believe this is a fair result because
an entity that is itself a "debt collector"--and hence subject
to the FDCPA--should bear the burden of monitoring the
activities of those it enlists to collect debts on its behalf.

We now turn to the status of CAH as a "debt collector."
As mentioned, CAH is the common general partner of CARC
and NTF, both of which are limited partnerships. App. at
1355. Some district courts have indicated that a general
partner of a "debt collector" partnership may be vicariously

38

liable for the partnership's FDCPA violations under general principles of partnership law.28See Peters v. AT&T Corp., 43 F. Supp.2d 926, 930 (N.D. Ill. 1999); Randle v. GC Servs., 25 F. Supp.2d 849, 850-52 (N.D. Ill. 1998); see also Miller v. McCalla, Raymer, Padrick, Cobb, Nichols, and Clark, 214 F.3d 872, 876 (7th Cir. 2000) (stating in an FDCPA case that "[t]he liability of a partnership is imputed to the partners, and so the plaintiff was entitled to sue the partners as well as the partnership"). The Houck plaintiffs, however, indicate that they "do not rely on [CAH's] vicarious liability" in this case. See reply br. of appellants/cross-appellees in Nos. 99-3858 and 99-3859 at 57. Instead, they argue that CAH is directly liable because it "is involved [in the collection of debts] through the corporations[sic] it has set up and fully control." Id.

Despite the Houck plaintiffs' conclusory statement that they do not rely on vicarious liability, in effect their argument that CAH is directy liable seems to us in fact to implicate vicarious liability principles because they contend that CAH's involvement in the debt collection is through the other defendants. Thus, we consider the case on that basis and conclude that the general partner of a "debt collector" limited partnership may be held vicariously liable for the partnership's conduct under the FDCPA. In light of the

_____

28. As we have indicated, NTF meets the definition of "debt collector." It is clear that CARC meets the definition as well. An affidavit of a CARC officer states that "NTF does not service or collect the . . . claims it owns," but instead "[t]he collection or servicing . . . is done by CARC, NTF 's servicing agent." App. at 514. CARC does not argue on this appeal that it does not meet the primary definition of"debt collector"; it merely argues that it falls under an exclusion for government officers or employees. We reject that contention in the succeeding section of this opinion.

We note that the FDCPA contains the following exemption from the definition of "debt collector": "[A]ny person while acting as a debt collector for another person, both of whom are related by common ownership or affiliated by corporate control, if the person acting as a debt collector does so only for persons to whom it is so related or affiliated and if the principal business of such person is not the collection of debts." See 15 U.S.C. S 1692a(6)(B). This exemption has not been raised in this case.

39

general partner's role in managing the affairs of the partnership, we see no reason why the general partner should not be responsible for conduct of the partnership which violates the FDCPA. Liability for the general partner is particularly appropriate under the facts of this case--NTF has no employees, app. at 514, and accordingly we presume that its actions are taken through the personnel of CAH. Indeed, an officer of CAH executed the Purchase Agreements on behalf of NTF, as well as the Servicing Agreements on behalf of CARC. See app. at 540, 874, 906, 1113. Accordingly, we conclude that CAH may be held liable for any conduct of NTF and CARC which violated the FDCPA.29

In sum, we conclude that NTF and CAH may be held liable under the FDCPA, and accordingly we will reverse the grant of summary judgment in their favor.

3. Whether CARC is exempt as a government officer or employee

CARC argues that it is exempt from the definition of "debt

_____

29. The Court of Appeals for the Seventh Circuit has stated as follows regarding the liability of shareholders and employees of "debt collector" corporations:

> Because such individuals do not become `debt collectors' simply by
> working for or owning stock in debt collection companies, we held
> [in a prior decision] that the [FDCPA] does not contemplate personal
> liability for shareholders or employees of debt collection companies
> who act on behalf of those companies, except perhaps in limited
> instances where the corporate veil is pierced . . . . Individuals who
> do not otherwise meet the statutory definition of`debt collector'
> cannot be held liable under the Act . . . . FDCPA suits against the
> owners of a debt collection company who are not otherwise debt
> collectors are frivolous and might well warrant sanctions.

Pettit, 211 F.3d at 1059 (citations omitted). Here, we do not deal with the liability of a shareholder of a "debt collector" corporation, nor do we deal with the liability of a person who merely works for a "debt collector" company. Rather, we deal with the liability of the general partner where the limited partnership meets the definition of"debt collector." We believe that a general partner exercising control over the affairs of such a partnership may be held liable under the FDCPA for the acts of the partnership. See Miller, 214 F.3d at 876.

collector" under 15 U.S.C. S 1692a(6)(C) because it is "in effect acting as an `officer or employee of the United States or any State' pursuant to the Servicing Agreements with the City and the PWSA." Br. of appellees/cross-appellants in Nos. 99-3856 and 99-3857 at 44-45. Section 1692a(6)(C) provides:

> The term [`debt collector'] does not include-- . . . (C) any officer or employee of the United States or any State[30] to the extent that collecting or attempting to collect any debt is in the performance of his official duties.

Like the district court, we reject this argument. The exemption expressly is limited to "any officer or employee of the United States or any State." CARC is not an "officer or employee" of any government entity. The exemption does not extend to those who are merely in a contractual relationship with the government. See Brannan v. United Student Aid Funds, Inc., 94 F.3d 1260, 1263 (9th Cir. 1996) ("This exemption applies only to an individual government official or employee who collects debts as part of his government employment responsibilities. USA Funds is a private nonprofit organization with a government contract; it is not a government agency or employee.") (emphasis added).

4. Substantive FDCPA violations

The homeowners claim that defendants have violated 15 U.S.C. S 1692f(1), which provides:

> A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt . . . . [T]he following conduct is a violation of this section: (1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

S 1692f(1) (emphasis added). The homeowners contend that defendants have violated this provision by collecting interest and penalty rates which are neither authorized by

_____

30. The term "State" includes political subdivisions. See 15 U.S.C. S 1692a(8).

41

agreement nor permitted by law--that is, rates in excess of
the ten percent limit set forth in Pa. Stat. Ann. tit. 53,
S 7143. The Pollice plaintiffs further claim that the
defendants have violated 15 U.S.C. S 1692e, which
prohibits the use of various "false, deceptive, or misleading"
representations or means by debt collectors. The district
court held that CARC has violated section 1692f(1)"to the
extent that it charged a rate of interest and penalties for
water and sewer claims not authorized by law," but it
expressly declined to rule on the section 1692e claims in its
summary judgment ruling. See Pollice, 59 F. Supp.2d at
486. In light of the district court's decision not to address
the section 1692e claims, we will not address them on
appeal. Further proceedings with respect to such claims
will be required on remand.

With regard to section 1692f(1), the question is whether
the rates of interest and penalties the defendants charged
are "expressly authorized by the agreement creating the
debt or permitted by law." We agree with the district court
that the rates are not "permitted by law" because they are
in excess of the ten percent limit set forth in Pa. Stat. Ann.
tit. 53, S 7143. Although the rates charged by the
defendants are in a sense authorized by the local
ordinances and resolution, we cannot say that they are
"permitted by law" as they are in direct violation of a state
statute.31

_____

31. The defendants raised before the district court the FDCPA's "bona
fide error" defense. A provision of the FDCPA states:

> A debt collector may not be held liable in any action brought under
> this subchapter if the debt collector shows by a preponderance of
> evidence that the violation was not intentional and resulted from a
> bona fide error notwithstanding the maintenance of procedures
> reasonably adapted to avoid any such error.

15 U.S.C. S 1692k(c). The defendants argued that "in determining the
rates to be charged plaintiffs, it relied on the representations of the
City,
School District and PWSA that the rates were appropriate, as well as the
fact that these entities had empirically been charging these rates."
Pollice, 59 F. Supp.2d at 486-87. The district court indicated that the
bona fide error defense may apply to errors of legal judgment as well as
clerical errors, but it denied summary judgment because "questions of

42

Defendants argue, however, that the rates are "expressly authorized by the agreement creating the debt." In this regard, defendants contend that "[w]here rates are set by municipal ordinance or regulation, the ordinance or regulation should be considered the `agreement creating the debt.' " Br. of appellees/cross-appellants in Nos. 99-3856 and 99-3857 at 39. In other words, they contend that a consumer who subscribes to water or sewer service impliedly agrees to pay the rates set forth by local laws. Defendants further contend that the rates are "expressly authorized" by the payment plans.

The Court of Appeals for the Second Circuit recently addressed section 1692f(1) in a case involving a debt collector's imposition of a service charge for a dishonored check. See Tuttle v. Equifax Check, 190 F.3d 9 (2d Cir. 1999). The court commented as follows:

> Under the FDCPA, [the debt collector] may impose a service charge if (i) the customer expressly agrees to the charge in the contract creating the debt or (ii) the charge is permitted by law. See 15 U.S.C.S 1692f(1). In other words,
>
> If state law expressly permits service charges, a service charge may be imposed even if the contract is silent on the matter;

_____

material fact exist concerning those measures which were taken by defendants to insure that they are entitled to charge a rate of over 10% in interest and penalties for past-due tax debts, water charges and sewer charges." Id. at 487. The district court's ruling on the bona fide error defense is not at issue on appeal, and accordingly we do not address the matter. It suffices to say that defendants may argue at trial that they cannot be held liable under the FDCPA based on their reliance on the local ordinances and resolution and the representations of the government entities. For purposes of section 1692f(1), however, we must conclude that defendants' rates are not "permitted by law."

The defendants further contend that the Pollice plaintiffs are estopped from challenging the legality of the interest and penalty rates based on a statement in an interrogatory response. See reply br. of cross-appellants in Nos. 99-3856 and 99-3857 at 12-13. As we indicated with regard to the unjust enrichment claim, see supra note 22, we leave it to the district court to determine if the Pollice plaintiffs in fact are estopped.

43

> If state law expressly prohibits service charges, a service charge cannot be imposed even if the contract allows it;
>
> If state law neither affirmatively permits nor expressly prohibits service charges, a service charge can be imposed only if the customer expressly agrees to it in the contract.

Id. at 13.32 The court further indicated that an agreement authorizing a particular charge need not be in writing; thus, a debt collector " `may collect a service charge on a dishonored check based on a posted sign on the merchant's premises allowing such a charge, if he can demonstrate that the consumer knew of the charge.' " Id. at 15 (quoting Federal Trade Commission Staff Commentary on the FDCPA, 53 Fed. Reg. 50,097, 50,108 (1988)).

Under the interpretation set forth in the Staff Commentary and Tuttle, the defendants presumably have violated section 1692f(1) regardless of the presence of any agreement authorizing the rates of interest and penalties, because state law specifically prohibits charging interest in excess of ten percent on the assigned claims. In any event, we do not believe the rates defendants charged are "expressly authorized by the agreement creating the debt." Although the agreement need not be in writing, we believe the term "expressly authorized by the agreement creating the debt" requires some actual knowledge or consent by the consumer during the course of the transaction which gives

_____

32. The court relied on a Federal Trade Commission Staff Commentary on the FDCPA. See 53 Fed. Reg. 50,097 (1988). The commentary provides:

> A debt collector may attempt to collect a fee or charge in addition to
> the debt if either (a) [sic] the charge is expressly provided for in the
> contract creating the debt and the charge is not prohibited by state
> law, or (B) the contract is silent but the charge is otherwise
> expressly permitted by state law. Conversely, a debt collector may
> not collect an additional amount if either (A) state law expressly
> prohibits collection of the amount or (B) the contract does not
> provide for collection of the amount and state law is silent.

53 Fed. Reg. at 50,108.

44

rise to the debt. As we have indicated, the "debts" which defendants have undertaken to collect are homeowners' original obligations arising out of their subscription to water and sewer services. The "agreement creating the debt" therefore was the transaction between each homeowner and the relevant government entity relating to the provision of water and sewer services. Defendants do not contend that the interest and penalty rates were "expressly" set forth in these agreements or transactions, nor do they contend that homeowners actually consented to or were aware of the rates when they subscribed to the services. The most defendants can say is that the rates were made an implicit part of such transactions because they are set forth in municipal ordinances and resolutions. We do not believe this suffices. Nor can defendants rely on the payment plans, as the plans are not the "agreement creating the debt." Rather, as stated, the "debts" to which all of defendants' collection activities have been directed are the original water and sewer obligations, which arose out of the transactions between homeowners and the government entities.

Thus, we conclude that defendants have violated section 1692f(1) by collecting amounts not expressly authorized by the agreement creating the debt or permitted by law.

5. Summary of conclusions regarding FDCPA claims

We will affirm the grant of summary judgment in favor of defendants with respect to the tax obligations, and we further will affirm the district court's determination that the water and sewer obligations constitute "debts" under the FDCPA. We will reverse the grant of summary judgment in favor of NTF and CAH, and we will affirm the district court's determination that CARC is not exempt from the definition of "debt collector." We further conclude, as did the district court, that defendants have violated section 1692f(1). We will remand for further proceedings on the FDCPA claims in light of these rulings.33

_____

33. As mentioned, such further proceedings will include a determination of defendants' entitlement to the "bona fide error" defense.

45

C. TILA Issues

1. Whether the payment plans constitute "consumer
       credit transactions"

The Pollice plaintiffs' claim under the Truth-in-Lending
Act ("TILA"), 15 U.S.C. S 1601 et seq., arises under 15
U.S.C. S 1638, which requires certain disclosures by a
"creditor" in connection with a "consumer credit
transaction." Plaintiffs argue that they entered into
"consumer credit transactions" when they entered into the
payment plans.

TILA defines "credit" as "the right granted by a creditor to
a debtor to defer payment of debt or to incur debt and defer
its payment." 15 U.S.C. S 1602(e) (emphasis added). It
further defines "consumer":

> The adjective `consumer', used with reference to a
> credit transaction, characterizes the transaction as one
> in which the party to whom credit is offered or
> extended is a natural person, and the money, property,
> or services which are the subject of the transaction are
> primarily for personal, family, or household purposes.

15 U.S.C. S 1602(h).

We believe that "consumer credit transactions" arose
when homeowners entered into payment plans with respect
to the water and sewer obligations. As to these obligations,
NTF has extended "credit" (the "right . . . to defer payment
of debt") to homeowners ("natural person[s]"), and the
"services" which are the subject of the credit transaction
(water and sewer) are "primarily for personal, family, or
household purposes." See sections 1602(e), (h).34

As to the tax obligations, however, the district court
concluded that the payment plans do not constitute

_____

34. This conclusion does not apply with respect to members of the Pollice
class who own property for business purposes, as opposed to owner-
occupants of homes. Water and sewer services provided to businesses
are not "primarily for personal, family, or household purposes." On
remand, the district court will have to distinguish between those who
own property for business purposes and those who are owner-occupants
of homes with respect to the TILA claim.

46

"consumer credit transactions." The court reasoned as follows:

> National Tax [NTF] claims that it is [not subject to TILA liability], at least with respect to the tax liens at issue, on the basis that the Court of Appeals has determined that a tax debt is not considered primarily for personal, family or household purposes under the FDCPA. See Staub, 626 F.2d 275. Defendants further contend that Regulation Z expressly states that the payment of tax liens is not considered `credit' subject to the TILA. The Federal Reserve Board Official Staff Commentary to Regulation Z, 12 C.F.R. Pt. 226, Supp. I at 299 (1998), concerning exclusions from the definition of credit found at 12 C.F.R. S 226.2(a)(14), provides that `tax liens, tax assessments, court judgments, and court approvals of reaffirmation of debts in bankruptcy' are excluded from the definition. The Staff Commentary continues, noting that `third–party financing of such obligations (for example, a bank loan obtained to pay off a tax lien) is credit for the purposes of the regulation.' 12 C.F.R. Pt. 226, Supp. I at 299 (1998).
>
> . . . National Tax, as the legal holder of the tax liens at issue, maintains the rights of the original holder of the liens. Such liens are not considered any less tax claims by virtue of their assignment to National Tax. This holding is consistent with Maierhoffer v. GLS Capital, Inc., where the court found that tax liens are assignable as a matter of law under the Municipal Claims and Tax Liens Act.
>
> While we have found that the payment plans offered by defendants altered the relationship between the parties so as to create a forbearance where none otherwise existed, we did not conclude that the nature of the underlying claim had been extinguished. Thus, we cannot agree with plaintiffs' contention that defendants somehow altered the nature of the tax liens by offering payment plans. The forbearance by National Tax under the terms of the payment plans does not constitute third–party financing as contemplated under Regulation Z. Further, National Tax, as the owner of

47

> the tax liens, is not a third party lender. Accordingly,
> we will grant defendants' motion for summary
> judgment with respect to the tax liens at issue . . . .

Pollice, 59 F. Supp.2d at 490-91.

We agree that the payment plans do not constitute "consumer credit transactions" with respect to the tax obligations. A "consumer credit transaction" involves the offer or extension of "credit" to a consumer. See section 1602(h). "Credit" is defined as "the right granted by a creditor to a debtor to defer payment of debt  or to incur debt and defer its payment." See section 1602(e) (emphasis added). As we have concluded with regard to the FDCPA, a tax obligation is not a "debt"; thus, the payment plans do not involve an extension of "credit" under TILA with regard to the tax obligations. Although section 1602 does not contain a definition of the term "debt," we believe the term as used in section 1602(e) should be construed as it is defined in the FDCPA.35 Simply put, the payment plans with respect to the tax obligations do not involve the granting of a right to defer payment of "debts," but rather the granting of a right to defer payment of tax obligations, which are not "debts."

We agree with the district court's interpretation of the Staff Commentary to Regulation Z, TILA's implementing regulation. See 12 C.F.R. pt. 226 (2000). The commentary provides as follows:

> The following situations are not considered credit for
> purposes of the regulation: . . . . Tax liens, tax
> assessments, court judgments, and court approvals of
> reaffirmation of debts in bankruptcy. However, third-
> party financing of such obligations (for example, a
> bank loan obtained to pay off a tax lien) is credit for
> purposes of the regulation.

12 C.F.R. pt. 226, supp. I at 299 (2000). The commentary thus implies that the granting of a right to defer payment of a tax obligation is not "credit" for purposes of TILA. We

---

35. Such a construction is logical in light of the similarity between the definition of "consumer" in section 1602(h) and the definition of "debt" under the FDCPA. See 15 U.S.C. S 1692a(5).

believe the payment plans are not analogous to the situation in which a third party, such as a bank, makes a loan to a consumer which is then used to satisfy a tax obligation. In that situation, the third party's loan to the borrower constitutes an extension of "credit" which is independent of the tax obligation--the lender grants the borrower the right to "incur debt [the loan] and defer its payment," see section 1602(e), and the loan is "for personal, family, or household purposes," see section 1602(h), because it is used to satisfy an obligation on the borrower's home.

Our reasoning with regard to the tax obligations is supported by Bonfiglio v. Nugent, 986 F.2d 1391 (11th Cir. 1993). In that case, state courts twice ordered the plaintiff to pay sums of money for fees and costs directly to the law firm which had represented his wife in divorce proceedings. Id. at 1392. The law firm agreed to allow the plaintiff to pay the sums in installments. Id. The plaintiff then sued the firm under TILA, claiming that the firm had failed to provide him with a financial disclosure statement when it agreed to allow him to pay in installments. Id. The Court of Appeals for the Eleventh Circuit, relying on the above-quoted commentary to Regulation Z, affirmed the dismissal of the plaintiff 's suit. The court commented:

> It is frivolous to contend that the Truth in Lending Act applies either to a debt created by a court order requiring one party to pay another's fees and costs, or to a related payment plan ordered by the court or worked out by the parties. `Credit,' as that term is used in the Truth in Lending Act, manifestly does not include court judgments or orders. [Citing commentary to Regulation Z]. [Plaintiff 's] court-ordered obligation to pay the two sums to his ex-wife's law firm, and the resulting installment plans, were clearly not `consumer credit transactions' within the meaning of the Truth in Lending Act.

Id. at 1393 (citations omitted) (emphasis added). We believe the same reasoning should apply to defendants' payment plans relating to the tax obligations.

In sum, we conclude that the payment plans constitute

49

"consumer credit transactions" under TILA with respect to the water and sewer obligations, but not the tax obligations. Accordingly, we will affirm the dismissal of the Pollice plaintiffs' TILA claim with respect to the tax obligations.36

2. Whether NTF is a "creditor"

NTF argues that it is not a "creditor" under TILA. "Creditor" is defined in pertinent part as follows:

> The term `creditor' refers only to a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement.

15 U.S.C. S 1602(f). Regulation Z provides:

> Creditor means: (i) A person (A) who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than 4 installments (not including a downpayment), and (B) to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is no note or contract.

12 C.F.R. S 226.2(a)(17)(i) (2000).37 "[W]hether one is a TILA
_____

36. While we affirm the dismissal of the claim relating to the tax obligations, we do not characterize the claim as"frivolous" as did the court in Bonfiglio.

37. Regulation Z further addresses the meaning of"regularly extends":

> A person regularly extends consumer credit only if it extended credit
>      (other than credit subject to the requirements ofS 226.32) more
>      than 25 times (or more than 5 times for transactions secured by a
>      dwelling) in the preceding calendar year. If a person did not meet
>      these numerical standards in the preceding calendar year, the
>      numerical standards shall be applied to the current calendar year.
>      A person regularly extends consumer credit if, in any 12-month

creditor is a bifurcated question, requiring a person both to be a `creditor' in general, by extending credit in a certain minimum number of transactions, and to be the `creditor' in the specific transaction in dispute." James Lockhart, Annotation, Who is "Creditor" within Meaning of S 103(f) of Truth in Lending Act, 157 A.L.R. Fed. 419, 443 (1999).

NTF does not present an argument on appeal, and apparently did not present an argument in the district court, regarding the first prong of the definition requiring that a person "regularly extends" consumer credit. Rather, NTF limits itself to the second prong of the definition. It contends that, even assuming the payment plans constitute "consumer credit transactions," there are no"debt[s] arising from" the payment plans. In this connection, NTF argues that the only "debts" involved are the water, sewer and tax obligations, which were "initially payable" to the government entities, not NTF.

Like the district court, we reject NTF 's arguments and thus hold that it is a "creditor" with respect to the water and sewer payment plans.38 The payment plans are the only "consumer credit transactions" involved here, as they represent the first time that anyone extended the homeowners the right to defer payment of their water and sewer obligations. On the face of the payment plan enrollment forms, they are directed to make payments to NTF through a custodian. See app. at 98, 213-21. Accordingly, any debts "arising from" these"consumer credit transactions" are "initially payable" to NTF.39

_____

period, the person originates more than one credit extension that is
subject to the requirements of S 226.32 or one or more such credit extensions through a mortgage broker.

12 C.F.R. S 226.2(a)(17)(i) at n.3 (2000).

38. The district court accepted CARC's argument that it is not a "creditor" under TILA because "it is merely an agent, rather than the entity to which the debts are payable." Pollice, 59 F. Supp.2d at 488 n.14. This holding has not been challenged on appeal.

39. The Staff Commentary to Regulation Z provides that "[i]f an obligation is initially payable to one person, that person is the creditor

The question arises, then, whether there are any debts "arising from" the payment plans. We have given due consideration to NTF 's argument that there are no debts "arising from" the plans because the plans merely provide for the extended payment of debts which previously arose from homeowners' dealings with the government entities. The definition of "credit," however, encompasses not only a right granted by a creditor to "incur debt and defer its payment" but also a right to "defer payment of debt." See section 1602(e). This latter phrase must encompass situations in which a debtor is granted the right to pay over time a pre-existing debt. See Bright v. Ball Mem'l Hosp. Ass'n, Inc., 616 F.2d 328, 336 (7th Cir. 1980) (indicating that a hospital which reached agreements with its patients prior to discharge to pay their bills in more than four installments was a "creditor" under section 1602(f)); Rogers Mortuary, Inc. v. White, 594 P.2d 351, 353 (N.M. Ct. App. 1979) ("Credit is extended [under TILA] when a consumer incurs a debt and the parties agree to a repayment schedule which allows for the deferred payment of the debt."). Yet, in such situations, the argument may be raised that the grantor of the right to defer payment is not a "creditor" under section 1602(f) because the debt does not "aris[e] from the consumer credit transaction." We reject such a construction, as we believe the term "creditor" was intended to apply to one who confers such a right to defer the payment of a pre-existing obligation.

We believe the statutory definition of "creditor" is satisfied in such cases because there is in essence a new"debt" which "aris[es] from" the "consumer credit transaction." Thus, there really are two types of "debt" at issue here. The first is the original "debt" owed by a homeowner to one of the government entities and later assigned to NTF. It is this "debt" as to which NTF has granted the "right . . . to defer

_____

even if the obligation by its terms is simultaneously assigned to another person." 12 C.F.R. pt. 226, supp. I at 300 (2000). Although NTF is an assignee of claims from the government entities, plaintiffs' theory is that
NTF is an initial creditor for purposes of TILA, rather than an assignee, because the first "consumer credit transactions" (the payment plans) are initially payable to NTF. See Pollice, 59 F. Supp.2d at 488 n.12.

52

payment" within the meaning of section 1602(e), and in turn the granting of this right gives rise to a "consumer credit transaction" within the meaning of section 1602(h). The second "debt" is the new "debt" which "aris[es] from the consumer credit transaction [the payment plan]" within the meaning of section 1602(f). It is this "debt" which is "initially payable" to NTF.[40]

NTF contends that a person who grants a right to defer payment of a pre-existing debt is a "creditor" only if he agrees to modify the relationship so as to give rise to some new obligation which is "initially payable" to him. According to NTF,

> the `right to defer' portion of section 1602(e) applies where an existing creditor agrees to modify a previously-agreed consumer debt, for example, by extending maturity of the debt in exchange for a higher interest rate. In that situation, there is (1) `credit' within the meaning of section 1602(e), (2) a `consumer credit transaction' under section 1602(h), and (3) a `creditor' under section 1602(f), because the new interest obligation is a `debt arising from' the new extension of credit, which is initially payable to the creditor.

_____

40. We point out that there is no inconsistency between our conclusion here that there is a "debt arising from" the payment plans for purposes of TILA and our prior rejection of the Houck plaintiffs' argument that the payment plans served to bring the tax obligations within the scope of the FDCPA. See supra part III.B.1. As stated, for purposes of the FDCPA, we view all of defendants' collection activity (including post-payment plan conduct) as activity undertaken for purposes of collecting the original obligations which were owed to the government entities and then assigned to NTF--the first type of debt described above. As discussed, the original tax obligations do not meet the FDCPA's definition of "debt," and therefore the FDCPA is inapplicable to defendants' conduct relating to the tax obligations regardless of the presence of payment plans. Unlike the FDCPA, which is directed at debt-collection activity, TILA focuses on the conduct of "creditors" who extend credit to consumers. Accordingly, for TILA purposes, we must consider the second type of "debt" which arises from the payment plans as "consumer credit transactions."

53

Reply br. of cross-appellants in Nos. 99-3856 and 99-3857 at 2. We reject NTF 's argument, as we see nothing in the language of section 1602 imposing such a requirement. Indeed, the language of section 1602(f) indicates that a person may be a creditor even if he does not impose any charge for the extension of credit--the first prong of the definition of "creditor" refers to a person who regularly extends consumer credit which either involves a finance charge or is payable in more than four installments. See section 1602(f). Thus, the definition contemplates that one who confers a right to pay a pre-existing debt in more than four installments will be a "creditor" regardless of whether any charge is imposed as an incident to such extension of credit.[41] See Bright, 616 F.2d at 334 n.2 ("Even if these agreements [to pay a hospital bill over time] did not involve an agreement to pay a monthly 3/4% finance charge, they could still be a `credit' agreement requiring disclosures since payment was to be in more than four installments."). We believe that a consumer who is given the right to pay a pre-existing debt in installments may benefit from TILA-mandated disclosures even if no charge is imposed for the extension of credit.

In sum, we conclude that NTF is a TILA "creditor" with respect to the payment plans for the water and sewer obligations, and accordingly the district court did not err in denying NTF summary judgment.

3. Applicability of the public utility exemption

NTF argues that TILA's public utility exemption is applicable with respect to the water and sewer claims. See 15 U.S.C. S 1603(4) ("This subchapter does not apply to the following: . . . (4) Transactions under public utility tariffs, if the Board [of Governors of the Federal Reserve System] determines that a State regulatory body regulates the charges for the public utility services involved, the charges for delayed payment, and any discount allowed for early payment."). Regulation Z provides:

_____

41. "Finance charge" is defined generally as "the sum of all charges . . . imposed directly or indirectly by the creditor as an incident to the extension of credit." See 15 U.S.C. S 1605(a).

54

This regulation does not apply to the following: . .. (c) Public utility credit. An extension of credit that involves public utility services provided through pipe, wire, other connected facilities, or radio or similar transmission . . ., if the charges for service, delayed payment, or any discounts for prompt payment are filed with or regulated by any government unit.

12 C.F.R. S 226.3(c) (2000) (footnote omitted); see Aronson v. Peoples Natural Gas Co., 180 F.3d 558 (3d Cir. 1999) (discussing this exemption).

NTF contends that it has charged the same interest and penalty rates with respect to the water and sewer claims as the rates established by City ordinance and PWSA resolution; thus, NTF contends that the rates are"filed with or regulated by" the government entities. NTF further contends that the Purchase Agreements and Servicing Agreements between the government entities and NTF and CARC have imposed tight governmental "oversight" over NTF 's and CARC's conduct.

The district court held that the exemption is not applicable:

Defendants argue that . . . when a debt arises from public utility services, it cannot constitute consumer credit. We disagree. While we recognize that a public utility is exempt from TILA disclosures upon extending credit to a debtor for utility services, the exemption is applicable only if the charges are filed [with] or regulated by a governmental unit.

In the instant case, as we have established, the payment plans offered by defendants constituted a new extension of credit. This new extension was made well after the liens and claims were acquired by National Tax [NTF]. Defendants cannot claim reliance on the public utility exemption, despite the fact that the nature of the utility claims and liens have not changed in essence by the assignment to National Tax. The distinction here is that utilities are overseen and regulated by a governmental unit to which National Tax is not subject.

55

The credit charges assessed by National Tax are not `filed with or regulated by any government unit,' as required under Regulation Z. While defendants argue that the City and relevant authorities approved all payment plans and charges, this type of contractual relationship is too tenuous to constitute the governmental unit regulation required for the exemption.

Pollice, 59 F. Supp.2d at 490 (footnote omitted).

We agree with the district court that the public utility exemption is not applicable. It is true that 12 C.F.R. S 226.3(c) does not contain an explicit requirement that the credit be extended by a public utility; the extension of credit must simply "involve[ ] public utility services." Nevertheless, we believe that Congress and the Board intended the exemption to apply only to public utilities-- entities which are highly regulated by the government. See 66 Pa. Cons. Stat. Ann. S 1301 et seq. (regulating public utility rates and rate-making). Although NTF is an assignee of claims arising from public utility services, and thereby stands in the shoes of the assignors, we reject its attempt to invoke the public utility exemption.

4. Summary of conclusions regarding TILA claim

We will affirm the dismissal of the Pollice plaintiffs' TILA claim as it relates to the tax obligations. We further conclude that the court did not err in holding that NTF is a TILA creditor, nor did it err in holding the public utility exemption inapplicable.

IV. CONCLUSION

In view of the aforesaid, we will affirm in part and will reverse in part. We will remand the case to the district court for further proceedings consistent with this opinion.42 The parties will bear their own costs on these appeals.

_____

42. In addition, we will dismiss the appeal at No. 99-3998. See n. 21, supra.

56

OBERDORFER, J., concurring in part and dissenting in part.

I fully agree with Judge Greenberg's masterful analysis of this very complex matter with one exception. I would also reverse and remand the district court's grant of defendants' motion for summary judgment dismissing the claim of the Houck plaintiffs under Pennsylvania's Loan Interest Protection Law ("LIPL"), Pa. Stat. Ann. tit. 41, S 101 et seq. See majority op. Part III.A.3. I am persuaded that if homeowners who agreed to payment plans assumed a personal liability in addition to any imposed incident to an original lien in rem, those homeowners have by those agreements given the creditor valuable additional consideration to forbear collection. If the payment plans created an additional personal liability, that liability imposed a detriment on the debtor by exposure of any free assets, future earnings and expectancies to the risk of a judgment, and reciprocally enhanced the value of the creditor's claim. The addition of this value to the creditor's claim together with the pre-existing interest obligation of the Houck payment plan participants could be in consideration "for the . . . use of money" within the meaning of the LIPL. As the Court has noted,

> If a creditor who collects [damages for detention, as distinguished from forbearance] agrees to forbear without imposing greater charges, then the post-forbearance charges are still in effect charges for detention . . . . The situation is fundamentally different where a new or higher rate is charged in connection with the forbearance.

Maj. op. note 18.

My colleagues "do not question the proposition that non-monetary as well as monetary consideration may be taken into account in determining if a creditor has extracted an unlawful amount of value in return for a . . . forbearance." Maj. op. p. 28. They conclude, however, that

> the interest and penalties paid by those who entered into payment plans have not been paid as consideration for NTF 's forbearance, . . . regardless of

57

> the fact that other things of value . . . may have been
> given as consideration.

Maj. op. p. 28.

I do not believe that the present record supports this conclusion. Indeed, it is undisputed that payment plan participants assumed a new obligation to pay attorneys' fees. In addition, there is a fact dispute as to whether they also assumed a personal liability. See maj. op. note 19. Most important, whether or not the parties intended any non-monetary thing of value to be consideration for forbearance by the creditor is a quintessential question of fact to be resolved in the first instance by a trier of fact.

Accordingly, I would also reverse and remand the district court's grant of summary judgment dismissing the claim of the Houck plaintiffs under "LIPL." To this limited extent, I respectfully dissent.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

58