**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 17-2114

GARRY CURTIS,

    Plaintiff – Appellee,

v.

PROPEL PROPERTY TAX FUNDING, LLC; PROPEL FINANCIAL
SERVICES, LLC,

    Defendants – Appellants.

Appeal from the United States District Court for the Eastern District of Virginia, at
Richmond.  John A. Gibney, Jr., District Judge.  (3:16-cv-00731-JAG)

Argued:  October 30, 2018       Decided:  February 6, 2019

Before DUNCAN, KEENAN, and DIAZ, Circuit Judges.

Affirmed by published opinion.  Judge Duncan wrote the opinion, in which Judge Diaz
joined.  Judge Keenan wrote a separate opinion concurring in part and dissenting in part.

**ARGUED:** Charles Kalman Seyfarth, O'HAGAN MEYER PLLC, Richmond, Virginia,
for Appellants.  Thomas Dean Domonoske, CONSUMER LITIGATION ASSOCIATES,
P.C., Newport News, Virginia, for Appellee. **ON BRIEF:** Elizabeth Scott Turner,
O'HAGAN MEYER PLLC, Richmond, Virginia, for Appellants.  Dale W. Pittman, THE
LAW OFFICE OF DALE W. PITTMAN, P.C., Petersburg, Virginia, for Appellee.

DUNCAN, Circuit Judge:

Appellants Propel Property Tax Funding, LLC and Propel Financial Services, LLC (collectively "Propel") entered into a Tax Payment Agreement (a "TPA") with Appellee Garry Curtis pursuant to Virginia Code section 58.1-3018. Curtis sued Propel on behalf of himself and other similarly situated individuals, alleging violations of the Truth in Lending Act (the "TILA"), 15 U.S.C. § 1601 *et. seq.*, the Electronic Funds Transfer Act (the "EFTA"), *id.* § 1693 *et. seq.*, and the Virginia Consumer Protection Act (the "VCPA"), Va. Code Ann. § 59.1-196 *et. seq.* Propel moved to dismiss Curtis's claims under TILA and EFTA, contending that the TPA is not a consumer credit transaction governed by those statutes. The district court denied Propel's motion and sua sponte certified two rulings for interlocutory review pursuant to 28 U.S.C. § 1292(b): (1) its determination that Curtis has standing to proceed on his EFTA claims against Propel and (2) its decision that these TPAs are consumer credit transactions for purposes of TILA and EFTA. For the reasons that follow, we affirm the district court on both issues.

I.

Virginia allows taxpayers to enter into agreements with third parties to finance payment of local taxes. Va. Code Ann. § 58.1-3018.[1] Under these agreements, a third

---

[1] The statute governs "any agreement whereby a third party contracts with a taxpayer to pay to a county, city or town on behalf of that taxpayer the local taxes, charges, fees or other obligations due and owing to the county, city or town" and states that "[s]uch agreement may have as its subject current taxes, charges, fees and (Continued)

party agrees to pay taxes owed to a locality on behalf of a taxpayer, and the taxpayer agrees to repay the third party in installments, with fees and interest. *Id.* The terms of the agreement, including repayment periods, interest rates, and other fees, are prescribed by statute. *Id.* For the period during which the taxpayer repays the third party, the locality tolls the enforcement period for the taxes owed. *Id.* § 58.1-3018(E). Nothing in the statute indicates that these agreements have any effect on tax liens that may be imposed by Virginia law.[2] If the taxpayer defaults on the agreement despite the third party's good-faith efforts to collect from him, the third party can ask the locality to reimburse the third party for any taxes paid and to reinstate the full tax obligation against the taxpayer (minus any principal payments made by the taxpayer to the third party). *Id.* § 58.1-3018(C). Upon reimbursement, "[a]ny right of the third party to payment" under the agreement terminates. *Id.* § 58.1-3018(C)(4).

Curtis owed $13,734.43 in residential property taxes to the city of Petersburg, Virginia and entered into a TPA with Propel to finance payment of them. The parties agree that the TPA at issue operates in conformity with Virginia's statutory framework, *id.* § 58.1-3018; *see* J.A. 32 (stating that under the terms of the TPA, "[o]ur financing of taxes on your behalf pursuant to this Agreement is made pursuant to Va. Code Section

---

obligations, delinquent taxes, penalties and interest, or any combination of the foregoing." Va. Code Ann. § 58.1-3018(A).

[2] For instance, Virginia state law imposes a lien on real property for tax payments associated with that property, Va. Code Ann. § 58.1-3340. Moreover, the TPA between Curtis and Propel explicitly disclaims any effect on tax liens. *See* J.A. 32.

3

58.1-3018"). For instance, the TPA requires Curtis to pay an origination fee equal to ten percent of his tax obligation, which is the maximum origination fee allowed under the statute. *See* Va. Code Ann. § 58.1-3018(B)(2); J.A. 30. The TPA also sets Curtis's interest rate at 10.95 percent, below the statutory maximum of sixteen percent, and specifies that no interest shall accrue during the first six months of the agreement, as the statute requires. *See* Va. Code Ann. § 58.1-3018(B)(2); J.A. 30. The TPA requires Curtis to repay Propel in monthly installments for ninety-six months, which is the maximum period allowed by the statute. *See* Va. Code Ann. § 58.1-3018(B)(2); J.A. 31.

Curtis nevertheless challenges the TPA and its associated documents as violating TILA, EFTA, and VCPA on several grounds. For instance, he contends that many of the terms of the TPA included incorrect amounts, that Propel did not include an itemized list of closing costs in the documents, and that the TPA was missing certain allegedly required financial disclosures. He also alleges that, as a condition of the TPA, he was required to agree to repay Propel by preauthorized electronic fund transfers ("EFTs") and that the required authorization form does not contain a space that would allow him to indicate that he declined to do so.

Curtis brought a proposed class action against Propel in federal district court, alleging violations of TILA, EFTA, and VCPA.[3] Propel moved to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), contending that the TPA is not subject to TILA or EFTA because it is not a consumer credit transaction and

---

[3] Curtis named Propel Property Tax Funding, LLC as the sole defendant in his TILA claim. He brought the EFTA and VCPA claims against both Propel entities.

4

that the TPA is exempt from the VCPA. The district court granted Propel's motion to dismiss as to the VCPA claim but denied its motion as to the TILA and EFTA claims.

The district court determined that Curtis had standing under EFTA because the harm that he alleged--making the TPA contingent on Curtis agreeing to preauthorized EFTs--was "exactly the type of harm that Congress sought to prevent when it enacted the EFTA." *Curtis v. Propel Prop. Tax Funding, LLC*, 265 F. Supp. 3d 647, 652 (E.D. Va. 2017). The district court also determined that the TPA is subject to TILA and EFTA because, as "third-party financing of a tax obligation" for "personal, family, or household purposes," the TPA is both a credit transaction and a consumer transaction and thus qualifies as a consumer credit transaction governed by those statutes. *Id.* at 652–53. However, the court certified for interlocutory review (1) its decision that Curtis has standing to proceed on his EFTA claims and (2) its determination that TPAs sanctioned by Virginia Code section 58.1-3018 are subject to TILA and EFTA as consumer credit transactions. This appeal followed.

## II.

Propel makes two arguments on appeal. First, Propel contends that Curtis does not have standing to bring a claim under EFTA because he did not adequately allege that Propel required him to agree to EFTs or that he made or attempted to cancel any EFT payments. Second, Propel contends that Curtis's complaint does not state a claim for relief under either TILA or EFTA because the TPA is not a consumer credit transaction

5

within the terms of those statutes. Before considering these issues, we first set forth the statutory framework to provide the necessary context for our analysis.

TILA and EFTA are consumer protection statutes that regulate the terms of certain transactions. 15 U.S.C. §§ 1601 *et. seq.*, 1693 *et. seq.* The purpose of TILA is "to assure a meaningful disclosure of credit terms" in order to improve consumer decisionmaking and "to protect the consumer against inaccurate and unfair" credit practices. *Id.* § 1601(a). Similarly, EFTA was enacted to establish "individual consumer rights" in the context of EFT transactions. *Id.* § 1693(b). Thus, both TILA and EFTA are "remedial consumer protection statute[s]" which we "read liberally to achieve [their] goals" of protecting consumers.[4] *Phelps v. Robert Woodall Chevrolet, Inc.*, 306 F. Supp. 2d 593, 596 (W.D. Va. 2003) (citation and internal quotation marks omitted) (referring to TILA); *cf. Hoke v. Retail Credit Corp.*, 521 F.2d 1079, 1082 n.7 (4th Cir. 1975) (explaining that we interpret the Fair Credit Reporting Act liberally in light of "its broad remedial purposes"). At issue in this appeal are TILA's requirement that creditors disclose certain information in consumer credit transactions, 15 U.S.C. § 1638, EFTA's prohibition on "condition[ing] the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers," *id.* § 1693k, and EFTA's requirement

---

[4] Our sister circuits have also endorsed this remedial approach to construing TILA and EFTA. *See Krieger v. Bank of Am., N.A.*, 890 F.3d 429, 438–39 (3d Cir. 2018) (TILA); *Marais v. Chase Home Fin. LLC*, 736 F.3d 711, 714 (6th Cir. 2013) (TILA); *Rosenfield v. HSBC Bank, USA*, 681 F.3d 1172, 1179–80 (10th Cir. 2012) (TILA); *Clemmer v. Key Bank Nat'l Ass'n*, 539 F.3d 349, 353 (6th Cir. 2008) (EFTA); *Bragg v. Bill Heard Chevrolet, Inc.*, 374 F.3d 1060, 1065 (11th Cir. 2004) (TILA); *Eby v. Reb Realty, Inc.*, 495 F.2d 646, 650 (9th Cir. 1974) (TILA).

that no consumer agreement may operate as a waiver of one of EFTA's substantive rights, *id.* § 1693*l*.[5]

Guided by the applicable statutes, we affirm the district court. First, we hold that Curtis has standing to bring claims under EFTA because the harm that he alleges is a substantive statutory violation that subjects him to the very risks that EFTA, a consumer protection statute, was designed to protect against. Second, we hold that the TPA is subject to TILA and EFTA because the TPA is a consumer credit transaction. Because the statutes define these terms separately, we consider them as such. We determine that the TPA is a credit transaction because it provides for third-party financing of a tax obligation and that it is a consumer transaction because, as financing of a real property tax debt, it is a voluntary transaction that Curtis entered into for personal or household purposes.

## III.

Propel contends that Curtis lacks standing to bring claims under EFTA. "We review legal questions regarding standing de novo," and "[w]hen standing is challenged

---

[5] The alleged substantive right at issue here is EFTA's requirement that consumers "may stop payment of a preauthorized [EFT]" by notifying the financial institution up to three days prior to a scheduled withdrawal. *Id.* § 1693e. With respect to EFTA, Curtis's complaint alleged violations of both § 1693k and § 1693*l*, but Propel's motion to dismiss only addressed § 1693k. The district court ordered supplemental briefing on § 1693*l*, in which Propel raised new arguments for dismissal. The district court declined to consider Propel's new merits arguments "because Propel failed to raise [them] in its initial briefs," but it did consider Propel's argument that Curtis lacks standing under § 1693*l*. *Curtis*, 265 F. Supp. 3d at 651. We follow the same approach here.

7

on the pleadings, we accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party." *David v. Alphin*, 704 F.3d 327, 333 (4th Cir. 2013) (emphasis omitted). In a class action case, we look to the standing of the named plaintiff. *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 343 (4th Cir. 2017).

To meet the constitutional minimum requirements for standing to sue, a "plaintiff must have . . . suffered an injury in fact, . . . that is fairly traceable to the challenged conduct of the defendant, and . . . that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). On appeal, Propel challenges the injury-in-fact requirement. A plaintiff meets this requirement if he alleges an injury that is "particularized," "concrete," and "actual or imminent, not conjectural or hypothetical." *Id.* at 1548 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

First, an injury must be particularized; that is, "it must affect the plaintiff in a personal and individual way." *Id.* (citation and internal quotation marks omitted). Here, Curtis's injury is particularized because it stems from his own TPA with Propel, which allegedly required him to consent to EFT authorization when he entered into the agreement and allegedly waived Curtis's right to cancel preauthorized EFTs as conferred by EFTA.

Second, an injury is concrete if it is "real, and not abstract." *Id.* (citation and internal quotation marks omitted). While a bare procedural statutory violation does not create a concrete injury, *id.* at 1549, the concreteness requirement is met where the plaintiff can show that the harm that he suffers as a result of a defendant's statutory violation is "the type of harm Congress sought to prevent" when it enacted the statute.

8

*Dreher*, 856 F.3d at 345–46 (holding that a plaintiff's injury was not concrete because the harm he suffered by the defendant's procedural statutory violation was "not the type of harm Congress sought to prevent when it enacted" the statute); *cf. Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998) ("[A] plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute.").

Here, Curtis alleges a sufficiently concrete injury to establish standing. The harm he alleges is not a "bare procedural violation," *Spokeo*, 136 S. Ct. at 1549, but instead is a substantive violation of the rights conferred by EFTA. Congress enacted EFTA to protect "individual consumer rights" in the context of electronic fund transfers. 15 U.S.C. § 1693(b). Among these substantive rights is the right of a consumer to enter into a credit agreement without being required to agree to preauthorized EFTs. *Id.* § 1693k. This is the same right that Curtis alleges that Propel violated in its TPA with him. Curtis also alleges that Propel violated another of EFTA's substantive rights when it included in the TPA an EFT stop-payment provision that was more restrictive than what EFTA requires. *See id.* §§ 1693e, 1693*l*. Thus, the injury he alleges is of "the type of harm Congress sought to prevent when it enacted" EFTA. *See Dreher*, 856 F.3d at 346.

Propel contends that Curtis's injury is not concrete because Curtis did not adequately allege that Propel required Curtis to agree to EFTs as a condition of the TPA. But on appeal, we construe the complaint in favor of Curtis and accept its material allegations as true. *See David*, 704 F.3d at 333. In his complaint, Curtis supported his

9

allegation that Propel provided him with no opportunity to decline EFT preauthorization and that Propel violated his substantive rights under EFTA with respect to cancellation of EFTs by pointing to the language and structure of the TPA and its supporting documents. This is sufficient to establish standing. *See id.*; *Spokeo*, 136 S. Ct. at 1548.

Finally, an injury must be "actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1548 (citation and internal quotation marks omitted). Propel contends that Curtis's injury is hypothetical because Curtis has not yet made an EFT payment or attempted to retract his EFT authorization. This argument mischaracterizes the injury. Curtis satisfies the injury requirement because he alleged that he was required to agree to EFT authorization as a condition of the TPA and that the TPA contained terms requiring him to waive EFTA's substantive rights regarding EFT withdrawal; whether he made EFT payments or attempted to withdraw EFT authorization is irrelevant. And even if we accept Propel's premise that Curtis has not yet been injured, Curtis would still have standing to challenge the TPA immediately because there is a "realistic danger" that Curtis will "sustain[] a direct injury" as a result of the terms of the TPA. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). Specifically, because Propel allegedly required Curtis to agree to preauthorized EFTs, when the time comes for Curtis to pay Propel,[6] he will either need to make an EFT payment or attempt to withdraw his EFT authorization in response. Therefore, Curtis's injury is "actual or imminent" for purposes of standing. *Spokeo*, 136 S. Ct. at 1548; *see Babbitt*, 442 U.S. at

_____

[6] According to the TPA documents, Curtis's first monthly payment to Propel was due on June 25, 2016.

10

298 ("[O]ne does not have to await the consummation of threatened injury to obtain preventative relief. If the injury is certainly impending, that is enough.") (citation omitted).

Thus, we affirm the district court's determination that Curtis has standing to proceed on his claims under EFTA because, viewing the complaint in the light most favorable to Curtis, he has alleged that he suffered an injury in fact.

IV.

Propel also contends that the TPA as authorized by Virginia Code section 58.1-3018 is not subject to TILA and EFTA and that, therefore, Curtis's claims under those statutes cannot survive a motion to dismiss under Rule 12(b)(6). On interlocutory review, "we employ the usual appellate standard governing motions to dismiss[,] . . . consider[ing] questions of law de novo and constru[ing] the evidence in the light most favorable to the non-movant." *EEOC v. Seafarers Int'l Union*, 394 F.3d 197, 200 (4th Cir. 2005).

The provisions of TILA and EFTA at issue on appeal only apply to the TPA if the TPA is a "consumer credit transaction." *See* 15 U.S.C. § 1638(a) (describing TILA's disclosure requirements for consumer credit transactions); *id.* § 1693k (stating EFTA's rule against preauthorized EFTs with respect to "the extension of credit to a consumer"). Because TILA and EFTA define the terms "credit" and "consumer" independently, we first consider whether the TPA is a credit transaction and, second, whether it is a consumer transaction.

11

A.

First, the TPA is a credit transaction within the meaning of TILA and EFTA. TILA defines credit as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f).[7] While credit has been defined to generally exclude tax liens and tax assessments by the official Consumer Financial Protection Bureau interpretation of TILA's implementing regulation (the "Staff Commentary"), the Staff Commentary, to which we defer, clarifies that "third-party financing of such obligations (for example, a bank loan obtained to pay off a tax lien) is credit for the purposes of the regulation." 12 C.F.R. Pt. 1026, Supp. I, pt. 1, cmt. 2(a)(14); *see Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 556 (1980) (explaining that the Supreme Court grants a "high degree of deference" to administrative interpretations of TILA and its regulations). Accordingly, the question here is whether the TPA is a credit transaction on the basis that it involves third-party financing of a tax obligation.

---

[7] Similarly, under EFTA, credit is defined as "the right granted by a financial institution to a consumer to defer payment of debt, incur debt and defer its payment, or purchase property or services and defer payment therefor." 12 C.F.R. § 205.2(f). Therefore, if the TPA involves credit under TILA, it also involves credit under EFTA. *See Clemmer*, 539 F.3d at 353 (explaining that, for questions under TILA and EFTA, "courts draw upon case law interpreting one statute for persuasive authority for another statute" because TILA and EFTA have "the common purpose of . . . protect[ing] consumers with respect to financial credit"); *Johnson v. W. Suburban Bank*, 225 F.3d 366, 379 (3d Cir. 2000) (finding provisions in TILA and EFTA to have the same meaning because "Congress would [not] have different intended meanings for identical statutory language contained in similar statutes").

We conclude that the TPA provides for third-party financing of a tax obligation as set forth in the statute for two reasons. First, it is clear from the terms of the TPA itself, which state that Propel will pay Curtis's taxes in exchange for installment repayments, interest, and fees from Curtis. By entering into that transaction, Curtis "defer[red] payment" of his property tax obligation by having Propel, a third party, pay it immediately in exchange for subsequent installment payments.[8] 15 U.S.C. § 1602(f). This is financing of a tax obligation, indistinguishable from the type of financing that occurs when a homebuyer takes out a mortgage with a bank to defer payment of the listing price in exchange for regular repayments. In this respect, the TPA thus operates as any other financing transaction would.

Second, the TPA is a financing transaction because it creates third-party obligations between Curtis and Propel. Specifically, the TPA requires Curtis to pay Propel interest and fees--an obligation wholly separate from Curtis's tax obligation to the locality and owed only to Propel. Similarly, when a homebuyer takes out a home mortgage, she agrees to pay the bank interest and fees--costs which are unrelated to the homebuyer's underlying obligation to pay the listing price to the seller. These characteristics of the TPA--that it allows Curtis to defer payment of his property taxes and that it creates third-party obligations between Curtis and Propel--align precisely with

---

[8] To be clear, the TPA itself, and not the Virginia statute authorizing such TPAs, is the mechanism deferring Curtis's tax obligation--much as is the case with respect to any other contract concerning a regulated transaction. For example, Virginia also regulates the terms of payday loans by statute, *see, e.g.*, Va. Code Ann. § 6.2-1817, but we see no reason why payday loans would not be considered a form of credit.

13

those of third-party financing of a tax obligation as allowed by the statute. To dismiss the third-party nature of the relationship between Curtis and Propel here would be to dismiss the Staff Commentary, which defines third-party financing of tax obligations as credit, altogether.

Propel contends that the TPA is not a credit transaction because it is different from a bank loan. While that may be true, it is also irrelevant. In discussing what constitutes acceptable third-party financing of tax liens and assessments, the Staff Commentary by its terms used a bank loan as an "example," not a limitation. 12 C.F.R. Pt. 1026, Supp. I, pt. 1, cmt. 2(a)(14). Whether an agreement is a credit transaction is not determined by how closely it resembles a bank loan. The inquiry is whether it provides for "third-party financing" of a tax obligation. *Id.*

Moreover, differences between the TPA and a bank loan do not transform the TPA into something other than third-party financing of a tax obligation. For instance, TILA does not only apply to payments made directly to consumers. We know this because, for example, TILA requires creditors to describe how much credit they provide "to [the consumer] *or on [the consumer's] behalf*." 12 C.F.R. § 1026.18(b) (emphasis added). Therefore, the fact that Propel pays the locality directly instead of loaning money to Curtis as a bank might[9] does not affect whether the transaction falls under TILA's definition of credit. Nor does the fact that the TPA is different from a bank loan because it is a regulated transaction that includes protections for both third-party lenders

_____

[9] We note, however, that we have no reason to suppose that a lending bank might not disburse funds directly to a third party at the direction of a borrower.

14

(reimbursement if the taxpayer defaults) and taxpayers (limited remedies for the third party if the tax obligation is reinstated by the locality upon default) compel a different result. *See* Va. Code Ann. § 58.1-3018(C). These protections do not change the underlying nature of the TPA as an agreement that provides a mechanism for taxpayers to finance payment of their tax obligations through a third party. Indeed, the TPA here involves third-party financing of a tax obligation on its face, and the plain language of the statute, regulations, and Staff Commentary in no way precludes TILA from covering transactions like this one.

In support of its view, Propel cites cases from the Third and Fifth Circuits that are neither binding nor, more importantly, analogous. *See Billings v. Propel Fin. Servs., LLC*, 821 F.3d 608 (5th Cir. 2016); *Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379 (3d Cir. 2000), *abrogated on other grounds by Tepper v. Amos Fin., LLC*, 898 F.3d 364 (3d Cir. 2018). Critically, in those cases, the third-party tax transactions at issue involved *transfers* of a taxpayer's tax lien from a locality to a third party. *See Billings*, 821 F.3d at 610; *Pollice*, 225 F.3d at 385–86. The Fifth Circuit reasoned that because "the tax obligation [wa]s simply *transferred* from the taxing authorities to the transferee lending institution, and there [wa]s no independent line of credit extended to the property owner," these arrangements were not third-party financing of a tax obligation subject to TILA. *Billings*, 821 F.3d at 613 n.4 (emphasis added) (citing *Pollice*, 225 F.3d at 409–11). Central to the Fifth Circuit's determination was the fact that the transaction involved a tax lien transfer, bringing the transaction closer to a direct tax obligation held by a third party as opposed to third-party financing of a tax obligation.

15

In stark contrast to those cases, the locality here does not transfer Curtis's tax lien to Propel. Instead, the locality retains the tax lien until Curtis has fully repaid Propel. *See* J.A. 32 (explaining as a term of the TPA that the locality will retain any tax liens and will not release any judgments until Curtis completely repays his balance to Propel). The tax obligation here is therefore *not* "simply transferred" from the locality to the third-party lender as it was in the cases on which Propel relies. *Billings*, 821 F.3d at 613 n.4. Rather, by operation of the TPA, Propel extends a line of credit to Curtis to finance the real property taxes that Curtis owes to the locality. The arrangement here thus severs the *direct* linkage to a preexisting tax obligation that has led to the general rule excluding tax liens from the definition of credit.[10] Instead, like a mortgage or a bank loan, the TPA involves a consumer enlisting a third party to help it defer payment of a debt in exchange for interest and fees.

Propel contends that the fact that the locality retains Curtis's tax lien makes the transaction look *more* like a tax obligation and thus is further evidence that the TPA is not a credit transaction. But the fact that a third party has an interest in the thing being financed does not transform a credit transaction into something else. Indeed, this is

---

[10] In contrast to our analysis, the Third Circuit's approach appears to do away altogether with the distinction that the Staff Commentary carefully draws between the lien itself, on one hand, and the third-party financing of that lien, on the other. *See Pollice*, 225 F.3d at 409–10 (holding that a tax lien transfer agreement was not a credit transaction under TILA because "the nature of the underlying claim" as a property tax had not "been extinguished"); *cf. St. Pierre v. Retrieval-Masters Creditors Bureau, Inc.*, 898 F.3d 351, 361 (3d Cir. 2018) (applying *Pollice* in the Fair Debt Collection Practices Act context to conclude that "the original source of the obligation--not the subsequent method of collection--determines whether an obligation constitutes 'debt'").

16

common in ordinary consumer credit transactions. For example, suppose a consumer purchases an automobile from a dealership and takes out a bank loan to finance it. Under the terms of that loan, the bank places a lien on the automobile until the consumer has paid off the balance. If the consumer sells the car to a secondhand buyer before she pays off the balance of her bank loan, the secondhand buyer might take the automobile subject to the lien. Any bank loan that the secondhand buyer might take out to finance his purchase of the automobile does not cease to be a credit transaction merely because the first bank still holds a lien over the automobile. Similarly, the TPA here does not lose its character as a credit transaction just because a third party--here, the locality--retains a lien related to the underlying obligation.

Indeed, straightforward application of the language of TILA, its regulations, and the Staff Commentary tells us unambiguously that the TPA is a credit transaction because it provides for third-party financing of a tax obligation. But even if the plain language were ambiguous, policy considerations would counsel us to interpret TILA and EFTA to cover transactions like the TPA here because "TILA is a remedial consumer protection statute that is read liberally to achieve its goals," and we "construe TILA broadly so that it will provide protection for the consumer." *Phelps*, 306 F. Supp. 2d at 596 (citation and internal quotation marks omitted). Under this standard, it would frustrate the purpose of TILA and EFTA to exclude the TPA here from regulation. Accordingly, we conclude that the TPA is a credit transaction under those statutes.

B.

17

Having established that the TPA is a credit transaction, we next consider whether it is also a consumer transaction within the meaning of TILA and EFTA. Under TILA, a consumer transaction is "one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes."[11] 15 U.S.C. § 1602(i). Although "[t]here is no precise test for what constitutes credit offered or extended for personal, family, or household purposes, nor for what constitutes the primary purpose," 12 C.F.R. Pt. 1026, Supp. I, pt. 1, cmt. 2(a)(12), there are things that seem, on their face, to qualify. Here, the subject of Curtis's transaction was his residential home, and he sought credit to finance the property taxes he owed on that home. It is hard to imagine a transaction more likely to constitute one "primarily for personal, family, or household purposes." *Id.*

Propel urges us to look to bankruptcy law by analogy, arguing that because tax obligations are not debt for purposes of bankruptcy, payment of those obligations cannot involve a consumer transaction. This argument is plainly contradicted by the Staff Commentary. The Commentary anticipates that consumer credit may be used to defer payment of tax obligations; indeed, it includes third-party financing of tax obligations within its definition of credit transactions covered by the statute. *See* 12 C.F.R. Pt. 1026, Supp. I, pt. 1, cmt. 2(a)(14).

---

[11] Under EFTA, a consumer is a "natural person," 15 U.S.C. § 1693a(6), so there is no dispute that Curtis is a consumer for purposes of EFTA.

Notwithstanding the Staff Commentary, however, Propel's argument fails even under bankruptcy law. When bankruptcy courts consider whether debt is consumer debt, they look "to the purpose for which the debt was incurred" to determine "whether debt is for 'personal, family, or household purposes.'" *In re Runski*, 102 F.3d 744, 747 (4th Cir. 1996) (quoting 11 U.S.C. § 101(8)). In that context, a debt that "was not incurred with a profit motive or in connection with a business transaction . . . is considered 'consumer debt' for purposes of [the Bankruptcy Code]." *In re Kestell*, 99 F.3d 146, 149 (4th Cir. 1996). Thus, under this test, Curtis's residential property tax obligation as financed by Propel is consumer debt because it is unconnected with any sort of business transaction or profit motive.

Propel nevertheless argues that the TPA is not a consumer transaction because the imposition of the *underlying* obligation--property taxes--is motivated by the public welfare rather than by personal, family, or household purposes. In support of this position, it cites to a non-binding case in which the bankruptcy court held that "a debt for personal property tax is not a consumer debt even where the property being taxed is held for personal, family, or household use." *In re Stovall*, 209 B.R. 849, 854 (Bankr. E.D. Va. 1997). In so holding, the bankruptcy court explained that "a consumer debt is one that is 'incurred'--implying that some *voluntary action* is taken before a consumer becomes liable on the debt. A tax, however, is not 'incurred.'" *Id.* (emphasis added) (citation omitted). Rather, it is "involuntarily imposed by a government for the public welfare." *Id.* But *Stovall* is not analogous. In that case, the debt at issue was the unpaid personal property tax itself, not credit obtained to finance the payment of that debt. In

contrast, the debt at issue here is not the tax that Curtis owes to the locality. Instead, it is one level removed--it is Curtis's obligation to Propel, a third party, to repay Propel's financing of Curtis's tax obligation.[12] Thus, even to the extent that *Stovall* holds that property taxes are not consumer debts, that holding is inapplicable.

We are therefore constrained to conclude that the TPA entered into pursuant to Virginia Code section 58.1-3018 at issue here is a consumer credit transaction subject to TILA and EFTA. We affirm the district court's denial of Propel's motion to dismiss for failure to state a claim under those statutes.

V.

We affirm the district court's decision that Curtis has standing under EFTA because he alleged that he suffered an injury in fact, and we affirm the district court's denial of Propel's motion to dismiss Curtis's TILA and EFTA claims because the TPA is a consumer credit transaction subject to those statutes.

*AFFIRMED*

---

[12] Further, the court in *Stovall* reasoned that personal property taxes are not consumer debts because they are incurred involuntarily, but here, Curtis entered the TPA with Propel voluntarily.

BARBARA MILANO KEENAN, Circuit Judge, concurring in part and dissenting in part:

I concur in Part III of the majority opinion affirming the district court's ruling that Curtis has standing to bring claims against Propel under the Electronic Funds Transfer Act, 15 U.S.C. § 1693 *et seq.* (EFTA). I write separately with respect to Part IV(A) because I conclude that Curtis' tax payment agreement with Propel (the TPA) does not qualify as a "credit transaction" under the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* (TILA).[1]

TILA defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f). The associated regulation and commentary known as "Regulation Z" clarifies that tax liens, tax assessments, and court judgments are excluded from the definition of "credit." 12 C.F.R. Pt. 1026, Supp. I, pt. 1, cmt. 2(a)(14). However, "third-party financing of such obligations (for example, a bank loan obtained to pay off a tax lien) is 'credit' for purposes of the regulation." *Id.* (internal quotation marks added).

In my view, the TPA does not qualify as a "credit" transaction because Virginia Code § 58.1-3018 (the Virginia statute), rather than a creditor, grants to a taxpayer like Curtis the right to defer payment of a local tax assessment by entering into a tax-payment plan with a third-party payor like Propel. Among other things, the statute gives the third-

---

[1] EFTA defines "credit" similarly to TILA, as "the right granted by a financial institution to a consumer to defer payment of a debt . . . and defer its payment." 12 C.F.R. § 205.2(f) (regulation implementing EFTA). I agree with the majority that if the TPA does not qualify as a credit transaction under TILA, it likewise does not qualify under EFTA.

21

party payor a right of recourse against the local government, Va. Code § 58.1-3018(C)(1), and terminates the TPA as a matter of law once the third-party payor has availed itself of that statutory remedy, *id.* § 58.1-3018(C)(4). Given these striking differences, some of which restrict the rights of the third-party payor against the taxpayer, I am puzzled that the majority opines that a TPA effectively "operates as any other financing transaction would." Maj. Op. 13. In my view, this simple declaration by the majority is factually and legally incorrect.

A TPA is not a "credit transaction," within the meaning of TILA, because the preexisting obligation of the taxpayer is not severed by the third-party payor's payment, and the third-party payor does not grant any right to the taxpayer that is not conferred already by statute. The TPA, a creature of Virginia statute, merely implements those statutory rights, with accompanying benefits to both the taxpayer and the third-party payor. The majority sidesteps this statutory framework and strains to conclude that the TPA must be a credit transaction under TILA because (1) Propel has advanced payment on behalf of the taxpayer, and (2) the taxpayer is required to pay that sum back to Propel, unless (3) the taxpayer later defaults on its TPA obligations and Propel obtains repayment from the locality. Any facial appeal of this approach, however, is undermined by the plain terms of the statute.

Virginia Code § 58.1-3018 authorizes the mechanism of TPAs and exercises substantial control over the formation and termination of such agreements. The statute defines TPAs as agreements in which an entity like Propel "contracts with a taxpayer to pay [local taxes] to a county, city or town on behalf of that taxpayer." Va. Code § 58.1-

22

3018(A). The statute further requires that the TPA "provide for the reimbursement of the third party by the taxpayer" in installment payments. *Id.* § 58.1-3018(B)(2).

Under this plain language, the Virginia statute authorizes the third-party payor to pay the taxpayer's outstanding local tax assessment in return for the taxpayer's promise to repay the third party in accordance with the TPA payment plan. The material terms of that payment plan are regulated by the Virginia statute. *See id.* (setting forth the maximum repayment period, the maximum interest rate, and the maximum origination fee). The statute also requires the third-party payor to provide monthly status reports to the local government regarding the taxpayer's compliance with the TPA. *Id.* § 58.1-3018(B)(4).

The locality's oversight of the taxpayer's compliance with the TPA continues throughout the repayment process. After the third party pays the locality on behalf of the taxpayer, the locality "toll[s]" any enforcement period for the taxes owed. *Id.* § 58.1-3018(E). Notably, the locality does not remove the lien or transfer it to the third-party payor, who lacks recourse against a defaulting taxpayer with respect to the underlying tax obligation if the third-party payor obtains reimbursement from the locality as permitted by statute. *Id.* § 58.1-3018(C)(4). Upon such repayment of principal from the locality, the TPA terminates as a matter of law and the locality "reinstates" the full amount of its tax assessment against the taxpayer, ending the tolling period of enforcement. *Id.* § 58.1-3018(C)(2), (4). Thus, the link between the taxpayer and the preexisting tax assessment is not severed by a TPA as the majority contends, but remains in effect throughout the course of the TPA's operation.

23

Contrary to the majority's conclusion, a TPA cannot realign this statutory relationship of the parties and transform the third party's payment of the tax assessment into a "credit transaction" under TILA. The Virginia statute merely invites a third-party payor to "front" the money for payment of the taxpayer's obligation, in return for receiving fees and interest allowed by the statute, and tolls enforcement of the tax lien against the taxpayer only so long as he complies with the parties' tax-payment plan. In other words, the TPA "changes only the entity to which" the taxpayer is "indebted for the taxes originally owed, not the *nature* of the underlying debt." *Billings v. Propel Fin. Servs., LLC*, 821 F.3d 608, 613 (5th Cir. 2016) (citation omitted).

Moreover, TPAs authorized by the Virginia statute differ dramatically from typical third-party financing of debt, such as "a mortgage or a bank loan," in which a "consumer enlist[s] a third party to help" defer payment "in exchange for interest and fees." Maj. Op. 16. Although the third-party payor under a TPA collects interest and fees from the taxpayer, any similarity to a bank loan ends there. A TPA is not an independent financial agreement in which a lender or its assignee retains full recourse against the individual receiving the benefit of payment. *See Billings*, 821 F.3d at 613 & n.4 (citing *Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 409-11 (3d Cir. 2000), *abrogated on other grounds by Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718 (2017)). And as noted, under a TPA, the taxpayer has a continuing obligation to the taxing locality until the taxpayer has paid the entire amount of the principal due under the TPA.

Because the third-party payor under a Virginia TPA cannot enforce the tax lien upon default by the taxpayer, the TPA bears even less resemblance to a standalone third-party financing of a tax obligation than the transactions at issue in *Billings* and *Pollice*. There, the localities had transferred the tax liens to the third-party payors, who thereby obtained that additional avenue of recourse against the taxpayers. *See Billings*, 821 F.3d at 610; *Pollice*, 225 F.3d at 385-86. Yet, in holding that these transactions did not qualify as "credit" under TILA, the Fifth and Third Circuits emphasized that the third parties nevertheless did not extend a "line of credit" independent from the tax obligation. *Billings*, 821 F.3d at 613 n.4; *see Pollice*, 225 F.3d at 410-11.

The same is true here. The TPA "did not *create*" a new debt "that would be subject to TILA," *Billings* 821 F.3d at 613, but instead granted Propel the authority to implement a payment plan with Curtis for his existing tax obligation, which is not subject to TILA.

I wish to emphasize that I appreciate the important purposes of TILA in protecting consumers from unfair lending practices. But in my view, any protection for Virginia taxpayers entering into TPAs is an issue to be resolved by Virginia, the sovereign entity creating this form of tax-payment plan. For these reasons, I would vacate the judgment of the district court that the TPA qualifies as "credit transaction" under TILA.[2]

---

[2] Based on this conclusion, I would not reach the question whether the TPA qualifies as a "consumer" transaction as addressed by the majority opinion in Part IV(B).